UNITED STATES of America, Appellee,

v.

Thomas BURGESS, Appellant.

No. 81–5314.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 1, 1982.

Decided Oct. 22, 1982.

Rehearing and Rehearing En Banc
Denied Dec. 13, 1982.

Michael S. Lieberman, Alexandria, Va. (John Kenneth Zwerling, John Kenneth Zwerling & Associates, P.C., Alexandria, Va., on brief), for appellant.

William G. Otis, Sp. Asst. U. S. Atty., Alexandria, Va. (Elsie L. Munsell, U. S. Atty., Clarence H. Albright, Jr., Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and MURNAGHAN, Circuit Judge.

MURNAGHAN, Circuit Judge:

Burgess is a Vietnam war veteran who suffered stressful experiences during his stay in that country, among them direct participation in the battle of the Plain of Reeds. Following his return to the United States and discharge from the Army, he was engaged, in May of 1981, in activities which led to a prosecution in the United States District Court for the Eastern District of Virginia on charges of (a) conspiracy to distribute cocaine,[1] (b) distribution of cocaine,[2] and (c) using a telephone to facilitate the distribution of cocaine.[3]

As the case evolved, performance by Burgess of the proscribed acts was not disputed.[4] His brief on appeal candidly concedes that the facts establishing the offenses were uncontested by the defense, that a *prima facie* showing was made by the Government, and that: "The entire defense

---

1. 21 U.S.C. § 846.

2. 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

3. 21 U.S.C. § 843(b).

4. Defendant's opening statement to the jury began: "There is really no contest here as to whether or not Tom Burgess on the dates as set out in the indictment committed the offense as charged in the indictment."

**1148**

rested upon whether or not Burgess was legally insane at the time of the offense."

The defense asserted a Post Traumatic Stress Disorder (PTSD) allegedly activated by Burgess' Vietnam experiences. Medical experts appeared for both parties. There was testimony which, if believed, established beyond a reasonable doubt that Burgess was not insane. The jury returned a verdict of guilty as to all three counts, and normally that should have concluded the matter.

■ Burgess contends, however, that, as the case was presented to the jury, he was mouse-trapped by the Government with the consequence that valuable testimony which would have materially strengthened his case was not introduced. As courts have had frequent occasion to observe, the question before us on appeal frequently boils down not to whether sufficient evidence of the commission of the crime charged was alleged and proven, but rather whether the accused's constitutional rights to due proc-

ess and especially to a fair trial were scrupulously protected.[5] We address that issue here.

The claim of Burgess centers on a colloquy between counsel and Judge Williams which occurred immediately prior to the presentation of the defense's case in chief. The colloquy commenced with a statement by one of the prosecutors questioning the relevance of certain evidence to which, in opening statement, defense counsel had alluded, specifically the experiencing by Burgess of the breaking up of his home. The position taken by the Government was that the evidence, while manifestly designed to evoke sympathy, was simply not probative as to the existence *vel non* of mental disease or defect.

There then evolved a brief exchange concerning the proper point in the trial at which other defense evidence should be offered.[6] Defense counsel indicated that the Government was expected in its rebuttal case to adduce evidence that the insanity

5. *E.g., United States v. Vida,* 370 F.2d 759, 764 (6th Cir. 1966), *cert. denied,* 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630 (1967):

   With increasing emphasis, we are cautioned that the patent guilt of an accused is wholly immaterial to an appellate court's consideration of the adequacy of a trial court's protection of his constitutional rights.

6. The normal approach in a case where a defense of insanity is raised contemplates:

   1) The Government's establishment of the performance by the defendant of the criminal acts.

   2) The defense-in-chief, in which evidence of insanity is introduced.

   3) Rebuttal by the Government, in which an attempt to prove sanity beyond a reasonable doubt is made.

   4) Surrebuttal, in which the defendant seeks to produce testimony to contradict the Government's evidence introduced during rebuttal, to the extent that such testimony should not already have been introduced during the defense-in-chief. *See United States v. Greene,* 497 F.2d 1068, 1083 (7th Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975):

   Fourth, defendant alleges error in the trial court's refusal to allow Mrs. Estopinal, mother of the defendant, to testify on surrebuttal about the history of mental illness in the family. The possibility of a genetic base to schizophrenia was first mentioned by a defense psychiatrist, Dr. Holzman, while cross-

   examined by the prosecution. Later, Dr. Feinerman, presented by the Government on rebuttal, mentioned, during cross-examination by defense, that genetics may be important in schizophrenia. Defense then sought to present Mrs. Estopinal's surrebuttal testimony. Assuming, *arguendo,* that the proposed testimony would be otherwise admissible, it was, nevertheless, offered too late. Surrebuttal evidence must meet and reply to evidence presented by the plaintiff in rebuttal. McCormick, Evidence § 4 (2d ed. 1972). Mrs. Estopinal's testimony could not have rebutted Dr. Feinerman's since he did not claim that defendant's family had no history of mental illness. Dr. Feinerman merely stated that he himself knew of no such history. Mrs. Estopinal's testimony properly should have been presented as part of the defense's case in chief.

   When the point of completion of a trial has been reached, which was the situation here, the trial judge should be vested with substantial discretionary powers to bring the evidentiary phase to a close, or to put it another way, to curb the natural tendency of vigorous counsel to get in the final word.... If it had been substantial or significant it was something which could have been readily known to the defendant and should have been brought before the jury as a part of the principal defense evidence.

defense was contrived, i.e., faked. Defense counsel pressed, in general terms and necessarily on an anticipatory basis, for rulings permitting, as part of the defense-in-chief, evidence described as going to show the genuineness of the PTSD insanity defense. The Government (also speaking, of necessity, in the abstract since the colloquy preceded the actual submission of any item of evidence on the insanity issue) objected to the introduction of such evidence as part of the defense's case in chief, contending that an orderly and proper development would dictate the deferral of such testimony to surrebuttal.

The trial then resumed. Following completion of the Government's rebuttal case, testimony proffered by the defense as surrebuttal was objected to by the Government and was in large measure, though not completely, excluded.

Obviously, if defense counsel was indeed led reasonably to rely on the Government's contention that testimony should be reserved for surrebuttal and was then foreclosed from introducing the evidence on the grounds that it properly was part of the defense-in-chief, an injustice has occurred which would mandate reversal and remand for a new trial. However, the Government replies that its remarks at the time of the colloquy were only intended and properly only could be read to go to evidence which indeed *was* proper surrebuttal. So long as the discussion was purely in generalities, it remained for defense counsel correctly to assess whether each item the defense wanted to put in evidence after the Government rested its rebuttal case properly met the criteria for surrebuttal. Evidence which should have been put in as part of the case in chief, or which, being merely repetitive of other evidence already before the jury, would not be proper surrebuttal testimony, could not have its status changed merely by application of the label "Surrebuttal." Defense counsel, the Government argues, had no reasonable basis for relying on the abstract statement of a prosecutor during the colloquy between court and counsel which indeed boils down simply to the truism: "Surrebuttal is surrebuttal." The statement did not authorize the holding back of testimony which went to the issue of insanity itself rather than to the issue of whether there had been an effort to fake insanity.[7]

Since the discussion at the colloquy between court and counsel was couched in terms general in nature, without specifically identifying the testimony which the Government contended should not be offered by the defense until surrebuttal, it becomes our responsibility to look to the several items of proffered testimony to determine into which category each, in fact, fell. To the extent that an item was not proper surrebuttal but indeed belonged, if admissible at all, in the defense-in-chief, the Government's position would be well taken.

In the colloquy between court and counsel Judge Williams, properly cautious, stated with respect to the Government's premature claim of irrelevancy: "I can't rule on it in any advisory way." He went on to ob-

7. Indeed, a difficulty overhanging the entire case is a lack of precision in using or appreciation in interpreting the term "surrebuttal." It, properly, is limited to refutation of the testimony of an opposing witness, and does not spill over to include testimony directed at something other than disproving, or at least casting doubt on what *that witness* said. McCoy was a Government witness who testified in the Government's rebuttal case that Burgess admitted that the insanity defense was feigned. Evidence that McCoy misunderstood what Burgess had said would be proper surrebuttal testimony. For example, another participant in the conversation could be produced to state that Burgess had said something quite different. However, it would not be surrebuttal, it would not refute McCoy, if a witness were produced to testify that, at a different point in time, and to a different person or persons than McCoy, Burgess had evidenced conduct indicative of mental defect or disease, and hence, inferentially, was not faking.

Stating the concept slightly differently, surrebuttal concerns refutation of the specific evidence of a witness. It is not a basis for a general attack on the overall conclusory inference to be drawn from his evidence. McCoy's testimony that Burgess admitted feigning insanity is not rebutted by other proof that Burgess was, in fact, insane. Such evidence would belong in the defense case-in-chief. *See* n.6, *supra*.

serve that testimony about the defendant in normal stress situations could be counter-productive to the establishment of the PTSD defense.[8] The court concluded: "I am sure that after the matter is looked at more maturely . . . it will be tempered in such a way that nothing objectionable will come out."

The colloquy then moved on to the observation from the defense that the Government had stated its intention in rebuttal to present testimony that the whole PTSD defense was contrived. Defense counsel raised the question of whether it could introduce in its case-in-chief corroborative evidence that Burgess was not faking the defense. Without specifying what the testimony would be, defense counsel stated a wish to have the testimony in the case in chief so that the jury would know "this is not a game that is being played on them."[9] The Government noted that testimony to refute a claim of fakery would be more properly restricted to surrebuttal.[10] The district judge sensibly responded by stating: "I will rule on those things when they come up."[11]

The defense's case-in-chief consisted of the testimony of two medical experts. Dr. Sonnenberg testified to a wide range of circumstantial matters leading him to the conclusion that Burgess suffered from PTSD and opined that, as a result, Burgess was legally insane. Dr. Levin testified as to four objective psychological tests given by him to Burgess and expressed his conclusion that the results confirmed Dr. Sonnenberg's diagnosis. In the course of his testimony, Sonnenberg explained that the information on which he relied came not from Burgess alone but in addition was confirmed from other "independent" sources, i.e., was not faked.

After the defense rested its case-in-chief, the Government, as part of its rebuttal, called McCoy, a personal acquaintance of Burgess. McCoy testified that Burgess himself had expressed disbelief in his own "Vietnam syndrome" defense and had stated that he would feign insanity at the trial. Commarato, a DEA agent, was called and stated his observation that Burgess' behavior at the time of the offense was "very cool, calm, very cautious, typical of a dope dealer." Also, the Government, as part of its rebuttal, submitted testimony of a medical expert, Dr. Pepper, who expressed the conclusion that the PTSD defense in gener-

---

**8.** The court observed:

> . . . I can't believe that anybody who is defending a case on the ground that they are victims of a post-Vietnam syndrome is going to dilute that defense by just running by all the normal stress situations that people cope with all the time.

**9.** The pertinent language of the colloquy read:

> MR. ZWERLING [defense counsel]: Your Honor, I think the Court is unaware of one particular problem which the Government has indicated to me they were going to put in rebuttal, and that is they are going to recall Mr. McCoy, who is going to say that Tom Burgess told him that he was going to fake this whole thing and that he was going to fool everybody. It's important, I think, for the jury to know that there is support for our evidence. We didn't want to bring this in, but we have a sister who can confirm a lot of these things. We didn't want to put everybody in, but just some of them, so that they know that this isn't a game that is being played on them.

**10.** The assistant United States Attorney stated:

> MR. SCHOTT: If that's the case, then those witnesses are more appropriately recalled in surrebuttal. And, the sister has been in the courtroom when we made a motion for a rule on witnesses.

**11.** In an important respect, therefore, the case differs from *United States v. Portis,* 542 F.2d 414, 416 (7th Cir. 1976), relied on by Burgess, where the defendant had sought in his case in chief to bring out from his psychiatrist comments on and criticisms of the report of the Government's psychologist. However, the trial court ruled, at the urging of the Government, that "it would be improper to impeach or contradict the testimony of a witness who had not yet testified." Nor was the evidence allowed when the defendant sought to introduce it on surrebuttal.

In the case *sub judice* no such exclusion of evidence at both points in the trial where it might have come in occurred; much was, indeed, introduced in the defense's case-in-chief; and the decision not to seek its introduction prior to surrebuttal was made by defense counsel, not through any compulsion of Government counsel or the trial court.

al was contrived, further concluding that Burgess was not suffering from PTSD.

Then the surrebuttal commenced. What happened reveals one of the difficulties flowing from the imprecise use of language.[12] In the earlier colloquy, counsel for the defense may have sincerely believed that the evidence they now sought to introduce on surrebuttal was the testimony which the Government had argued should be reserved for surrebuttal and not introduced as part of the defense's case-in-chief. However, that belief must have derived simply from defense counsel's own estimate as to the surrebuttal character of the testimony. There is nothing to suggest that the Government took a surrebuttal stance with respect to any specific evidence, only to turn around and object successfully later on on the grounds that the evidence did not merit the description of surrebuttal but rather properly was material that should have been introduced as part of the defense-in-chief. We are unwilling to say that the Government must accept responsibility for a misunderstanding deriving from the imprecise use of legal terminology. It was not the fault of Government counsel that testimony not truly surrebuttal in character was intended to be encompassed in defense counsel's statement that, to re-

fute the charge of contrivance, which defendant expected would at a future time be injected into the case, he did want to get the testimony before the jury and intended to try to do so in the defense-in-chief. The trial judge very properly indicated that he would not rule in advance and left to counsel what was indeed counsel's responsibility, namely, the decision as to when was an appropriate time for the testimony to be offered.

It becomes, therefore, necessary to consider the evidence of which Burgess contends he was wrongly deprived, to see to what extent, if any, he is on sound ground. There were four witnesses involved in the defense effort to construct a surrebuttal case. First, the defense produced a fellow soldier who had served in the same battle in Vietnam with Burgess. His testimony would have gone to establish the existence of the battle of the Plain of Reeds, one of the major stress factors which had been identified by Dr. Sonnenberg. However, the Government, as part of its efforts to establish fakery, had never suggested in any way that the battle had not taken place, with Burgess a participant, or that Burgess had not told Dr. Sonnenberg about it. Dr. Sonnenberg had in his direct testimony referred to the battle.[13] It was well

12. It deserves mention that the effectiveness of presentation of the Government's case suffered and the strain placed on the Court proportionately increased in consequence of the absence at oral argument of Government counsel who had participated in the trial itself. Counsel who did appear at oral argument on appeal was forced to rely purely on the cold record, without personal participation in exchanges which took place in the course of the trial. He could hardly speak with the same confidence as to the impact of the record taken as a whole on the principal issue raised on appeal. And even if he could, there is nevertheless an irrepressible tendency to pay more attention to the description of what took place at the trial when offered by a person who was present there than when given by a person who first participates on appeal.

Of course, cases can arise where it would not be possible for trial counsel for the Government to be present at the argument on appeal. Such was not, however, the case here.

Accordingly, we emphasize, with the hope that our request will be heeded, that it both will

ease the burden on the Court and insure the most effective presentation on behalf of parties generally, and in the context of the present case of the Government in particular, if counsel who tried the case is present for the oral argument.

13. Dr. Sonnenberg testified:

There were two major traumas, three let's say minor ones. One major one was the combat that took place in the Plain of Reeds where Mr. Burgess was pinned down behind a tombstone in a graveyard. He had no water, he had no ammunition, and he was there for about 48 hours. He saw seven of his comrades killed and thirteen wounded. And, as I say, he had no water, no ammunition, and couldn't do anything. He witnesses bodies being mutilated, dead bodies being mutilated by continuing enemy gunfire.

He also killed two people in that, in that engagement, and that as well was stressful to him.

The other major stressor had to do with shooting a little girl. A little girl, who he

within the discretion of the district judge, in our judgment, to exclude the testimony of the witness proffered in surrebuttal since it injected no new issue [14] and would merely have been repetitive of the prior testimony of Dr. Sonnenberg.[15]

Most importantly, as the case had developed, the evidence which the trial judge did not admit at the late surrebuttal stage did not constitute material which the Government had opposed and had succeeded in excluding as part of the defense-in-chief. Nothing which had occurred at the colloquy, consequently, dictated that the testimony of the fellow soldier should have been allowed in surrebuttal.

A close personal friend of Burgess, Betsy Hatch, was then proffered to testify that the topic of Vietnam was off limits insofar as Burgess was concerned and that he never discussed it. Her testimony would also have described Burgess' condition in May of 1981 and the dramatic deterioration in his condition following his mother's funeral. Again, exclusion was based on the grounds that the testimony was merely repetitive.[16]

The purport of the testimony was once again to establish the existence of PTSD rather than to rebut a case of fakery. While the two concepts may on occasion tend to merge, we are satisfied that it fell within the trial judge's discretion to exclude

---

thinks was maybe between five and eight, was walking down the road with a hand grenade. Now, the pin had been pulled from the hand grenade, but there was a release mechanism, a spring mechanism so that as long as you held the hand grenade in your hand, it wouldn't explode. This is how he explained it to me, but I have never seen this hand grenade.

Now, the little girl was walking towards Mr. Burgess and two or three of his comrades. She was Vietnamese. He saw the hand grenade, he saw that the pin was removed, and he kept shouting at her to stop, he wanted her to throw it away. Of course, she didn't understand him. We will never know, he doesn't know whether she knew what she was doing, but she approached, and as she approached closer and closer Mr. Burgess felt that he had to shoot her because if he didn't—

14. It is to be emphasized that none of the so-called surrebuttal contradicted McCoy's quotation of Burgess to the effect that he was going to feign insanity. None went to cast doubt on the accuracy of Commarato's assessment of the behavior of Burgess at the time the drug dealing took place. *Cf. United States v. Durnin,* 632 F.2d 1297, 1301 n.8 (5th Cir. 1980):

Since this rebuttal testimony raised no new issue and since the proffered surrebuttal witnesses were not able to rebut the essence of Mr. Magee's testimony, the district court's decision to disallow surrebuttal was not an abuse of discretion.

In that vital respect the present case is to be distinguished from *Merrill v. United States,* 338 F.2d 763, 766 (5th Cir. 1964), where evidence introduced in the Government's rebuttal also tended to prove that the defendant had admitted that he was feigning insanity. There, however, the surrebuttal which should have been admitted was the defendant's own testimony to

explain away his admission to the court and jury.

15. *See Kines v. Butterworth,* 669 F.2d 6, 13–14 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982):

[W]hen the testimony is offered at a late stage of the trial in surrebuttal, and it is repetitious of evidence presented earlier to the jury, the trial judge's exercise of discretion excluding it should not be interfered with unless the ruling is so prejudicial that it necessarily prevents a fair trial.... While the judge might have permitted the testimony to be presented we do not find that the ruling excluding the testimony was fatal to the defense, or demonstrated any lack of that fundamental fairness essential to a fair trial.

16. For example, Dr. Sonnenberg had testified:

Q Was there one particular event post-Vietnam which in your opinion triggered or added impact on his already diagnostical condition of posttraumatic stress syndrome?

A Yes. At the time of his mother's death he learned that in fact his father had not died when he was two or three years old, but that his father had been alive until he was sixteen years old. He learned details of his father's life, that his father had died an alcoholic, that his father had wrecked the marriage to his mother, that his father had been unable to maintain himself vocationally, and I think the most relevant factor to what is going on here today that he learned was that his father had been stealing amphetamines and selling them, and that his father was arrested and sent to jail for that.

There was also evidence, already submitted, to the effect that:

Well, although he [Burgess] did not talk about the experiences very much, it was obvious to me, he said that his Vietnam experiences are frightening and upsetting.

the testimony, especially since it was already before the jury. Otherwise, expansive surrebuttal would contribute to the undue prolongation of cases and the reiteration several times over of the same evidence.[17]

Dr. Levin, one of the experts earlier called by Burgess, was also produced for surrebuttal purposes. He was put forward to testify that the defense was not, in his opinion, fabricated. Assuming that such a contradicting expression of expert opinion constituted surrebuttal testimony, nevertheless the district judge was justified in not permitting the testimony for the independent reason that it was merely repetitive of what had already been stated by Dr. Levin in the defense's case-in-chief.[18] Thus, had Dr. Levin been asked, during the defense case-in-chief, the very questions he was not permitted to answer on surrebuttal, a ruling excluding the testimony as repetitious would have been well within the trial judge's discretion.

█ Repetitiveness is a justifiable basis for excluding evidence offered on surrebuttal even though it may otherwise be relevant.[19]

Finally, in the case of Dr. Sonnenberg, who was the last witness offered on surrebuttal, some questions were permitted to be asked and answered.[20] However, the court

---

**17.** We have had occasion to observe with respect to the defense of insanity that "the goal of expediting the trial must not be allowed to interfere with the defendant's right to develop fully and completely the many complex and often tenuous circumstances that may shed light on his plea." *United States v. Smith,* 507 F.2d 710, 712 (4th Cir. 1974).

We do not now disavow or circumscribe that statement in any way. The *Smith* case concerned exclusion of relevant evidence purely on substantive grounds, not for failure to offer it in the defendant's case-in-chief, when it should have come in. Judge Williams evidenced no inclination to exclude testimony offered at the appropriate time, as evidenced by the fact that much of the evidence Burgess wished to introduce on surrebuttal had been admitted when offered as part of the defendant's case-in-chief.

**18.** The previously admitted testimony of Dr. Levin ran:

Q Is there a specific value to the psychological battery of tests that you gave to Mr. Burgess?

. . . .

Q Do they have any built-in safeguards to protect malingering?

A Some of them do, and some of the tests I gave do.

Q And how did Mr. Burgess do as far as indications of malingering or making things up?

A There were two tests I looked at for that determination, one of which is the Rorschach. There have been studies one on the Rorschach where people have been asked to pretend that they are mentally ill and give responses, and in this way it is known how people who are pretending do as compared to those who have mental illness.

Mr. Burgess did not appear to be pretending on that instrument. I would have expected somebody who was pretending to have

seen very shocking things, and these didn't appear.

\* \* \* \* \* \*

A There are specific validity indicators on the MMPI [Minnesota Multiphasic Personality Inventory] test which are designed to be looked at to see if the person is basically answering truthfully. These were not extremely elevated in Mr. Burgess' case. There is one particular indicator if the person is attempting to look worse than they really feel, and this ratio was not particularly elevated.

**19.** *See United States v. Stirling,* 571 F.2d 708, 736 (2d Cir. 1978), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978):

Finally, they [defendants] argue that the district court erred in excluding one Peter Turzik . . . as a surrebuttal witness . . . [T]he district court at the same time allowed Joseph Kirkland . . . to testify in surrebuttal to much the same effect that Turzik would have. Further evidence would have been cumulative. We can hardly say that the district court abused its discretion in this regard.

*See also* n.15 *supra.*

**20.** The transcript of his surrebuttal testimony reads:

Q Dr. Sonnenberg, I have just a very few specific questions for you. Number one, did you concoct this defense in order to help Mr. Burgess or for any other reason?

A Certainly not.

Q Did you coach Mr. Burgess in how to try to establish that he had this disease, or that there was a connection?

A Certainly not.

\* \* \* \* \* \*

Q Dr. Sonnenberg, hypothetically, if Mr. Burgess had told Mr. McCoy, a fellow indict-

excluded an attempted reiteration of the testimony that materials other than what Burgess told Dr. Sonnenberg were significant and relied on by him in reaching his conclusion. Once more the testimony was simply repetitive.[21] The evidence merely served to reemphasize the defense-in-chief rather than to contradict the Government's rebuttal case.

■ Thus any error with respect to the timing of the attempts to introduce the evidence characterized by counsel for Burgess as "surrebuttal" must be laid to defense counsel and not to the court or to the prosecution. However, the statement that defense counsel may have erred in putting off until the defense's surrebuttal case evidence not properly admissible at that late and quite tightly circumscribed stage of the case should not be deemed to amount to an expression that there may have been ineffective representation by counsel. In the first place, we are, for sound and obvious reasons, strongly disinclined to make such a judgment on direct appeal, when counsel has had no opportunity to speak to his side of the matter. *See United States v. Lurz,* 666 F.2d 69, 78 (4th Cir. 1981), *cert. denied sub nom. Magill v. U. S.,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874; *sub nom. Steedman v. U. S.,* ── U.S. ──, 102 S.Ct. 2966, 73 L.Ed.2d 1354 (1982).

In the second place, moreover, as a strategic matter, counsel may well have taken a calculated risk, hoping to succeed in a plausible (though ultimately, for reasons we have adduced, unsound) approach. He could well have viewed the prosecutor's statement during the colloquy ("If that's the case, then those witnesses are more appropriately called in surrebuttal.") as manna from heaven or a life line thrown to a drowning man. Boldly seeking to expand the meaning of the observation of his opponent beyond its reasonable limits, defense counsel, had he succeeded, would have achieved the maximum effect in dissipating or obscuring the significance of the damaging testimony as to the contrived nature of the defense. On the other hand, were the testimony to have been offered and admitted where it properly belonged, that is before the Government's rebuttal, as part of the defense's case-in-chief, it could have been expected to have far less impact. The latest piece of evidence on the subject, being a direct quotation of Burgess himself that he was faking, was apt to be the most effective with the jury.

So counsel may well have been doing the very best by his client in making an attempt—albeit ultimately an unsuccessful attempt—to obtain a change in the customary order for the proper introduction of evidence.[22] The game was probably well worth the candle, especially when it is taken into account that whatever evidence was lost was largely cumulative of other testimony which had previously been admitted.

[21] As part of the defense case in chief, Dr. Sonnenberg had testified:

ee eventually, that this defense was a bunch of garbage, to clean it up a little, would that have any effect on your diagnosis?
A No.
Q And why not?
A Because Mr. Burgess wants to go to jail.

    \*    \*    \*    \*    \*    \*

THE COURT: The part that related to Mr. McCoy I think is proper surrebuttal.

**21.** As part of the defense case in chief, Dr. Sonnenberg had testified:
Q In coming to that conclusion did you rely solely on the information he gave you?
A No. As a matter of fact, I wouldn't have done this in a normal situation, but because of the nature of the proceeding I saw a whole host of letters from different people, friends, old family friends, sisters, his former wife, men who he worked for as a child, and friends of his from where he was living just before he was arrested. I also saw his military records. I have also seen psychological test reports, that was after I made the diagnosis. I have also seen, as I say, some of his military records.

So, there has been an enormous volume of material that I have seen, and I didn't index it and memorize it, but I can tell you that there wasn't one thing that I found that didn't go along with my diagnostic impression, and there were no large areas of history where I didn't get confirmation. So, it was quite a bit of confirmation for what I believed.

**22.** If so, he was but exhibiting "the natural tendency of vigorous counsel to get in the final word." *United States v. Greene,* 497 F.2d 1068, 1083 (7th Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).

It should be borne in mind that prospects for achieving a successful defense were exceedingly remote. Commission of the acts constituting the substantive offenses, in counsel's judgment, could not be refuted. Yet confession and avoidance provided little hope of an escape for Burgess from the rigors of the law. Alignment of the insanity defense with statements made by Burgess while the crimes were still in their evolutionary stage expressing comfort that he would be well prepared, if caught, to defend against criminal charges,[23] would not be easy. The apparently antithetical nature of the positions, the innate improbability of coalescing a calculating cocaine pusher with someone who could not appreciate the criminality of his acts or conform his conduct to the requirements of law,[24] could hardly be lost on the jury. Thus an extraordinary and unorthodox approach, even one with little chance of success in the presence of an astute trial judge and alert Government counsel, would have been understandable. Defense counsel may have perceived an opening for delaying or repeating the defense's most effective testimony when the prosecutor, on the basis of a generality, arguably might be said to have called for postponement of much of defendant's evidence to the surrebuttal phase.[25]

■ There are numerous other contentions raised by Burgess. First, Judge Williams, following a discussion with counsel prior to closing arguments of proposed jury instructions, determined *sua sponte* to add language to flesh out the discussed instructions. Without informing counsel prior to closing arguments, he inserted the following:

> Bear in mind also, ladies and gentlemen, that experts, and particularly medical experts, are dependent upon information that they receive in taking a history from the patient. If the patient gives them false information in that history, the experts' opinions and conclusions can be flawed because the material he had to work with was unreliable.

The case for the proposition that the charge was substantively in error is unpersuasive. "Garbage in, garbage out" is a concept not exclusively confined to computers. In light of the testimony, both of Dr. Sonnenberg and of Dr. Levin, that they relied on other materials and did not base their opinions solely on what Burgess had told them, the instruction was more apt to be harmful to the Government, whose expert had not testified as to independent verification on which to base his conclusions.

The only potentially troublesome point raised by the defense is the contention that the *sua sponte* and uncommunicated character of the instruction created error violating F.R.Crim.P. 30. The rule, dealing with jury instructions, permits any party to file written requests as to instructions. The court is then required to inform counsel of its proposed action upon the requests prior to closing arguments.[26] An obvious short answer

**23.** Burgess asked one undercover agent, while the transaction in cocaine was still "in progress" a revealing question:

> Yes, sir. He asked me on one occasion if anything went wrong with a deal, if my people would take care of me legally, that his would take care of him, but would mine take care of me.

**24.** *See, e.g., United States v. Smith,* 507 F.2d 710, 711 n.2 (4th Cir. 1974).

**25.** We do not mean to suggest that counsel are justified in disregarding established rules of procedure to obtain a tactical advantage or that sanctions will not be imposed for doing so. Here, however, the argument that the evidence should be characterized as proper surrebuttal was not entirely frivolous. The stakes were

high. It is not yet a perfect world, and the tendency to bend rules is too pervasive in American society not to take it into account in trying to surmise what may have influenced the actions of counsel. Consider only the common practice in American basketball of the patently intentional foul, committed to regain possession, when the possible gain may appear to exceed the loss for poor sportsmanship.

**26.** F.R.Crim.P. 30, in pertinent part, provides:

> · At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall

could be that the instruction here dealt with was not the consequence of a request by either party, rendering F.R.Crim.P. 30 altogether inapplicable. However, the Seventh Circuit has expressed itself otherwise in *United States v. Bass,* 425 F.2d 161, 162–63 (7th Cir. 1970):

> ... [U]nder Rule 30 ... we think counsel should be informed of all instructions that will be given to the jury and to read Rule 30 as being applicable only to instructions proposed by counsel would emasculate its purpose which is in part to allow counsel, knowing the instructions to be given, to effectively argue his case to the jury.

We see no necessity for resolving a potentially extremely serious and far reaching question as to the proper interpretation of F.R.Crim.P. 30, since, even accepting the statement in *Bass* as good law,[27] a remand would not be called for in the circumstances of the present case. For all the circuits which have dealt with the problem, including the Seventh Circuit which decided *Bass,* require a showing of prejudice. *See, e.g., United States v. Lyles,* 593 F.2d 182, 186 (2d

Cir. 1979), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), and *sub nom. Johnson v. United States,* 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794 (1979), and *sub nom. Holder v. United States,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979); *United States v. Newson, supra,* at 983 (citing F.R.Crim.P. 52(a)).

We are satisfied that, even if Rule 30 requires that the court inform counsel of its *sua sponte* modification of the instructions prior to closing argument, there was no prejudice. Defense counsel was careful in closing argument to refer to the fact that there was independent confirmation of the facts which were relied on by defense experts to conclude that Burgess had suffered PTSD.[28]

■ Next we turn to the defense's contention that it should have been allowed to employ for demonstrative purposes charts listing the diagnostic criteria for PTSD. The district judge was well within the scope of his discretion in ruling that visual aids were not to be used to conduct the examination, since the points could adequately be made simply by verbal testimony.[29]

---

27. The statement in *Bass* was not necessary to decision, for the Court determined that, as a substantive matter, the *sua sponte* instruction was in error.

The weight of authority as to the reading to be given Rule 30 is to the contrary. *See United States v. Newson,* 531 F.2d 979, 982–83 (10th Cir. 1976) ("It is also clear that although the trial court must inform counsel as to their requests for instructions, absent such requests, the court need not inform counsel of the instructions to be given."); *United States v. Clarke,* 468 F.2d 890, 891–92 (5th Cir. 1972). Even the Seventh Circuit has watered down the *Bass* rule to permit the trial judge, following closing arguments, to modify an instruction "to prevent the jury from becoming confused and deciding the case on a false basis." *See United States v. Shirley,* 435 F.2d 1076, 1078 (7th Cir. 1970).

28. With respect to Dr. Sonnenberg's testimony, the defense noted: "He also testified under oath that he had not relied simply on Tom Burgess' testimony, but had outside confirmation for each and every one of those things.

inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed.

There has been absolutely no impeachment about that." With respect to Dr. Levin, the defense told the jury:

> The MMPI test that he ran, again this also had built-in safeguards so that people who are trained to go in and try to fool the test get caught, they have worked on that. Tom was not fooling when he took that test, according to Dr. Levin.

29. *See Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974):

> Much of the material offered by petitioners was not of demonstrated relevance to the issues in this case. Such of it as may have been clearly relevant was subject to the District Court's observation that it would tend to create more confusion than enlightenment in the minds of the jury, and to the court's expressed willingness to *permit the same material to be treated in the testimony of expert witnesses.* The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body. We agree with the Court of Appeals that the District Court's discretion was not abused.

Again on the basis that verbalization was an adequate means for presenting a proposition, the judge, in the proper exercise of his discretion, refused to permit Dr. Sonnenberg to use a blackboard "to draw a diagram that will describe in metaphorical terms his [Burgess'] experience of guilt. I want to put on the blackboard a diagram that concerns his life history and the stages of guilt he was experiencing." [30]

■ The defense further contends that there was error sufficient to require reversal in the district court's ruling that the psychiatrists for both parties might remain in court despite the F.R.Evid. 615 provisions calling for exclusion of witnesses. Rule 615 permits an exception in the case of "a person whose presence is shown by a party to be essential to the presentation of the case." It was the Government's contention that its medical expert, Dr. Pepper, needed to be present. The court did not abuse its discretion, particularly since it evenhandedly afforded the same opportunity to the defense. See Morvant v. Construction Aggregates Corp., 570 F.2d 626, 629–30 (6th Cir. 1978), cert. dismissed, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). There it was held that:

> [W]here a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal.

The circumstances in the instant case were such that the ruling permitting the two medical experts for the defense, and the Government's expert, to remain in the courtroom throughout was not an abuse of discretion. Written reports from the medical experts were delayed to the point that they were forthcoming from defendant only two days prior to commencement of the trial, and, from the Government, on the second and last day of trial. It was reasonable not to place the experts under such short time constraints for familiarizing themselves with each other's findings by reading through reports, and, therefore, reasonable to permit all of them to appear in court.

It is unnecessary to decide whether the absence of any demonstrable prejudice flowing from the failure to exclude the Government's medical expert would, in all events, eliminate the force of the contention. We have so ruled in a case where the record disclosed no prejudice to the defendants on trial. United States v. Harris, 409 F.2d 77, 81 (4th Cir. 1969), cert. denied, 396 U.S. 965, 90 S.Ct. 443, 24 L.Ed.2d 430 (1970). However the case antedated the effective date of the Federal Rules of Evidence. It is arguable that the specific language of F.R. Evid. 615 automatically mandates reversal whenever noncompliance with the rule is shown. See United States v. Warren, 550 F.2d 219, 227 (5th Cir. 1977), modified en·banc, 578 F.2d 1058, 1076 (5th Cir. 1978), cert. denied, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978). We need not, and do not, address that question.[31]

■ The defense further contended that a government participant in the trial who remained in the courtroom [32] prejudiced the defense's case by a statement in the pres-

[Emphasis added.]

**30.** See n.29, supra. Cf. United States v. Brickey, 426 F.2d 680, 686–87 (8th Cir. 1970), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970) ("Furthermore, the usage and admission of charts is largely within the discretion of the trial court and its action in permitting the usage of charges will not be reversed unless this discretion has been abused.").

**31.** Cf., however, United States v. Bobo, 586 F.2d 355, 366 (5th Cir. 1978), cert. denied sub nom. Rowan v. United States, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979), reh. denied, 441 U.S. 957, 99 S.Ct. 2188, 60 L.Ed.2d 1062 (1979); Wood v. Southwestern Bell Telephone Co., 637 F.2d 1188, 1194 (8th Cir. 1981); Government of the Virgin Islands v. Edinborough, 625 F.2d 472, 474 (3d Cir. 1980); United States v. Oropeza, 564 F.2d 316, 326 (9th Cir. 1977), cert. denied, 434 ·U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

**32.** See F.R.Evid. 615(2) exempting from the exclusionary rule "an officer or employee of a party which is not a natural person designated as its representative by its attorney."

ence of the jury that Burgess "was about to turn on his crying act." In the first place, there is no sufficient evidence that the statement was overheard by any juror. In the second place, the remark is no more than a repetition of the Government's claim that the PTSD defense was contrived. The defense admitted that it could not prove prejudice and, that being the case, the district judge did not abuse his discretion in denying a new trial on those grounds.

Inasmuch as the defense concedes the occurrence of the substantive offenses, and indeed that was "never contested by Burgess," we need not long delay over a supposedly undue restriction of impeachment of a primary Government witness to the substantive elements of the crime. There was no abuse of discretion. *See United States v. Dominguez,* 604 F.2d 304, 310 (4th Cir. 1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980) ("The scope of permissible impeachment of a witness in a criminal trial generally is committed to the sound discretion of the trial court."). Furthermore, the district judge gave the defense the opportunity to ask the witness the desired question outside the presence of the jury, indicating that he would reconsider his ruling depending on what answer the .witness might give. That was an eminently reasonable procedure. Yet, defense counsel never followed up by requesting that the testimony be given outside the jury's presence.

■ Finally, complaint is voiced about the fact that the trial judge leaned back in the course of closing argument, closing his eyes while he did so. The judge observed:

There is no question that I leaned back and I closed my eyes, but I wasn't nodding at all, I was totally alert.

We know of no rule requiring the judge to refrain from closing his eyes, especially during closing argument of counsel. The argument, after all, was addressed to the jury who had the responsibility to weigh counsels' comments in the course of its deliberations.

Finding no reversible error, we affirm the judgment below.

*AFFIRMED.*

BUTZNER, Circuit Judge, dissenting:

I dissent. The district court impermissibly limited the scope of Burgess's surrebuttal. As a consequence, Burgess did not receive a full and fair hearing on his defense of insanity.

In his opening statement, defense counsel outlined the testimony of several witnesses whom he intended to call on the issue of Burgess's sanity. The government objected to the relevancy of some of the proposed testimony. Defense counsel justified the testimony as necessary to meet a charge of fakery that the government intended to present in rebuttal. The prosecutor responded that "those witnesses are more appropriately recalled in surrebuttal."

Conforming to the government's position on the order of proof, the defense presented its case-in-chief without calling the witnesses whose testimony the government characterized as surrebuttal.

After rebuttal by the government, defense counsel attempted to introduce evidence on surrebuttal. Despite the lack of objection, the court refused to allow Betsy Hatch to testify. It correctly recognized that her proffered testimony was relevant to the issue of Burgess's sanity. Indeed, her testimony, if believed, would have supported the opinion of Burgess's psychiatrist that he was not faking insanity. Nevertheless, the court excluded her testimony, saying: "Here again, I am excluding this, this isn't rebuttal. Rebuttal is a very narrow concept." *

While "a litigant is not entitled to a perfect trial but only a fair trial," an impor-

---

\* The court also excluded the testimony of two other witnesses, and limited the testimony of a third, on the basis that their testimony was not proper surrebuttal. The rulings pertaining to these three witnesses, though contrary to the agreed order of proof, do not constitute reversible error because their proffered testimony was either irrelevant or repetitive with respect to the charge of fakery. *See* Fed.R.Crim.P. 52(a).

tant element of fairness is the opportunity for a criminal defendant to be heard. *United States v. Portis,* 542 F.2d 414, 418 (7th Cir. 1976). "[W]here the plea is insanity, the goal of expediting the trial must not be allowed to interfere with the defendant's right to develop fully and completely the many complex and often tenuous circumstances that may shed light on his plea." *United States v. Smith,* 507 F.2d 710, 712 (4th Cir. 1974). This principle is peculiarly applicable to this case where, after counsel agreed to the order of proof, the court excluded relevant testimony because it viewed the sequence inappropriate.

I would vacate the judgment and remand the case for a trial at which all relevant testimony would be admitted. Preferably Burgess's witnesses should be allowed to testify during his case-in-chief, as his counsel first proposed. If the government, however, maintains its position and Burgess again acquiesces, the testimony should be admitted during surrebuttal.