**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 94-5489

GUILLERMO CORTINA,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CR-92-36)

Argued: November 3, 1995

Decided: January 3, 1996

Before MICHAEL and MOTZ, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jill Kramer Traina, Coral Gables, Florida, for Appellant.
Kenneth Davis Bell, First Assistant United States Attorney, Charlotte,
North Carolina, for Appellee. **ON BRIEF:** Daniel H. Forman, DAN-
IEL H. FORMAN, P.A., Miami, Florida, for Appellant. Mark T. Cal-
loway, United States Attorney, Charlotte, North Carolina, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Guillermo Cortina of one count of conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a) and 846. In asking us to reverse his conviction, Cortina argues (1) that he was unduly prejudiced by Rule 404(b) evidence admitted against a codefendant, (2) that the government violated a non-attribution agreement by making improper use of information gleaned from him during unsuccessful plea negotiations, (3) that the government violated a sequestration order, (4) that the evidence was insufficient, and (5) that venue was improper. After considering each of these arguments, we affirm.

I.

Cortina, Juan Carlos Escobar and Jaime Rodriguez were tried together. In the middle of the trial Escobar pleaded guilty. Based on the following evidence, the jury found Cortina guilty of the cocaine conspiracy charged in the indictment.

Cortina supplied multi-kilogram quantities of cocaine on credit to Jose Barrena in Miami. Barrena then drove to Charlotte, North Carolina, and delivered the cocaine to Escobar. Escobar, in turn, distributed the cocaine to Emery Jay Evans for retail sale in North Carolina. Money from the sales would flow back from Evans to Escobar, then to Barrena, and finally to Cortina, the main supplier.

Once, Evans complained to Barrena about the quality of eight kilograms in one shipment of Cortina's cocaine. Barrena reported Evans' complaint to Cortina, who responded (1) that Evans should sell the bad portion at cheap prices and (2) that he (Cortina) would give Evans a "good deal" on the next shipment. Evans was arrested by the DEA before the next shipment, and he agreed to cooperate with the govern-

2

ment. Evans, in a taped telephone call, reminded Barrena of the prior bad shipment and asked him to get 30 kilograms of good cocaine from Cortina. Barrena agreed, and he was arrested as he delivered the cocaine to Evans. Barrena also agreed to cooperate with the government. Barrena then made several DEA-monitored telephone calls to Cortina. Among other things, Barrena asked Cortina to come to his apartment to pick up the money for the 30-kilogram shipment to Evans. When Cortina arrived with Rodriguez, they were both arrested.

II.

On appeal Cortina first challenges "other bad act" evidence introduced against his codefendant Rodriguez under Federal Rule of Evidence 404(b). The evidence was about a drug meeting (unrelated to the conspiracy charged here) between Rodriguez and Angel Oropeza, a convicted drug dealer who was cooperating with the government. Cortina rode to the meeting place (a gas station) with Rodriguez, but Cortina did not participate in the Rodriguez-Oropeza conversation. Cortina argues that this evidence, although properly admitted against Rodriguez, had a prejudicial spillover effect mandating reversal of Cortina's own conviction. This argument fails.

Rodriguez's defense was that he had no connection to the Cortina-Barrena-Escobar-Evans conspiracy. Thus, Rodriguez testified that when he accompanied Cortina to Barrena's apartment, he had no idea that Cortina intended to accept drug money. To counter this defense, and to show Rodriguez's guilty intent, the government proffered, and was allowed to introduce, evidence that Rodriguez was present at the earlier (gas station) drug meeting with Oropeza. This evidence included Oropeza's testimony about the meeting and DEA agent Jaime Camacho's testimony that Oropeza, through photographs, had identified both Rodriguez and Cortina as having been present at the meeting.

At first the government indicated that this evidence would be offered against both Rodriguez and Cortina. Cortina's counsel objected, arguing mainly that Cortina "was merely present," "[n]ever said anything," and was not involved in "any discussion about drugs." The prosecutor considered the objection overnight and the next morn-

3

ing said that the evidence would not be offered against Cortina. The prosecutor then asked the district court to grant Cortina's request for an instruction that the evidence did not apply to him. The following exchange then took place between the court and Cortina's counsel:

> THE COURT: All right. I tell you what I'll do: I'll deliver the standard 404(b) instruction and then I will indicate that this 404(b) evidence which is coming in is not to be considered against your client at all.
>
> [CORTINA'S COUNSEL]: Okay.
>
> THE COURT: It is not evidence against your client.
>
> [COUNSEL]: Which I assume means that this man will not identify my client or any of that, won't be asked about that?
>
> THE COURT: Oh, no. Oh, no. Your client will be identified. But this is not to be considered. This is evidence only against [Rodriguez].
>
> [COUNSEL]: Okay. But just the identification of him being there present and that's it?
>
> THE COURT: That's it.
>
> [COUNSEL]: Okay. Got no problem with that.

Before Oropeza and Agent Camacho testified, the court gave the jury a Rule 404(b) instruction as to Rodriguez and warned the jury that it could "not consider this evidence [about the gas station meeting] at all in [its] deliberations concerning Mr. Cortina." Then, without objection from Cortina, Oropeza testified about his meeting with Rodriguez and identified Cortina as the person who got out of Rodriguez's car during the meeting. Agent Camacho testified after Oropeza. Camacho said that Oropeza had picked both Rodriguez and Cortina out of separate photo lineups as being present at the gas station meeting. When the government sought to introduce the photo

4

spread relating to Cortina, Cortina's counsel objected and was overruled.

The only issue before us is whether the district court abused its discretion in admitting the photo lineup exhibit relating to Oropeza's identification of Cortina.

First, the photo lineup was simply cumulative of previous evidence that had been admitted without objection: Oropeza had already pointed to Cortina and said he was at the gas station meeting. And, Agent Camacho had testified about Oropeza's earlier identification of Cortina in the photo lineup. Only after this testimony did the government offer the exhibit with the photo spread that included Cortina. Although Cortina's counsel objected to its admission, by that time Cortina's presence at the gas station meeting had been established.

Second, the prior act evidence against Rodriguez cannot be considered inevitably prejudicial to Cortina if the potential prejudice was avoided by an appropriate cautionary instruction. See United States v. Figueroa, 618 F.2d 934, 936 (2d Cir. 1980); United States v. Mounts, 35 F.3d 1208, 1215 (7th Cir. 1994), cert. denied , 115 S. Ct. 1366 (1995). Here, the trial court repeatedly warned the jury that the Rule 404(b) evidence was not to be considered against Cortina. Cortina has not given us any reason to believe that the jury did not follow the trial court's careful and repeated instructions on this point.

The district court did not abuse its discretion in admitting the photo lineup as part of the Rule 404(b) evidence.

III.

Cortina next argues that the government violated a non-attribution agreement by using information obtained from him during plea negotiations. We must reject this argument because the record does not establish a violation by the government.

The agreement provided that Cortina's

> statements . . . may be used against him for impeachment
> purposes, only, in any criminal proceeding in which Guil-

5

lermo Cortina testifies under oath, on the record, and in the presence of counsel . . . unless the said information has (prior to Mr. Cortina's said statements) already been developed by law enforcement officers through a source other than Mr. Cortina.

During plea negotiations Cortina told the government that his brother, Eduardo, had been killed in Colombia during a drug deal gone bad. At trial, after another of Cortina's brothers, Digno, testified that Eduardo died while trying to break up a fight, the prosecutor sought to impeach Digno through questions implying that Eduardo died during a drug deal. Cortina's counsel did not object. This cross-examination would have been objectionable unless the government's information about Eduardo's death had (as the agreement specified) "already been developed by law enforcement officers through a source other than Mr. Cortina." See also Fed. R. Crim. P. 11(e)(6); Fed. R. Evid. 410(3). However, because defense counsel did not object to this cross-examination at trial, the government was not challenged to show that its information about Eduardo's death came from a source other than Cortina. The alleged violation of the non-attribution agreement is, therefore, waived unless there is plain error. Fed. R. Crim. P. 52(b).

To reverse for plain error, there must have been (1) an error, (2) which was plain, and (3) which affected the defendant's substantial rights. United States v. Olano, 113 S. Ct. 1770, 1776-77 (1993). After reviewing the record, we cannot determine the ultimate source of the government's information about the cause of Eduardo's death. Again, in the absence of an objection, the government had no reason to try to prove an independent source. At bottom, we cannot say that the government did not develop the information before it talked with Cortina. There was no plain error.

IV.

During part of the trial, witnesses Evans and Barrena were placed in the same courthouse holding cell, in violation of a sequestration order under Federal Rule of Evidence 615.* The violation occurred

_____

*Rule 615 permits the court to "order [non-party] witnesses excluded so that they cannot hear the testimony of other witnesses." Courts also invoke the rule to prohibit out-of-court witness contact.

6

after Evans had testified but before Barrena had done so. Cortina argues that his conviction must be reversed because the government violated the sequestration order. We disagree.

Rule 615 aims to prevent witnesses from shaping their testimony in response to the testimony of other witnesses. See United States v. Leggett, 326 F.2d 613, 614 (4th Cir.) (per curiam), cert. denied, 377 U.S. 955 (1964). When an in-court violation of a Rule 615 order occurs, a criminal defendant need not show that the violation prejudiced him. United States v. Farnham, 791 F.2d 331, 335 (4th Cir. 1986); United States v. Burgess, 691 F.2d 1146, 1157 (4th Cir. 1982). In that circumstance a conviction may be upheld only if the violation was harmless beyond a reasonable doubt. Farnham , 791 F.2d at 335.

An out-of-court Rule 615 violation, though, is a different story. So long as the violation is not flagrant and the improper witness contact outside the courtroom "had no substantial influence on the jury verdict," the verdict may be upheld. United States v. Harris, 39 F.2d 1262, 1268 (4th Cir. 1994). When an out-of-court violation is brought to the attention of the trial court, the court's decision to declare a mistrial, to exclude witness testimony, to hold responsible parties in contempt, or to let the trial proceed unabated is reviewed for abuse of discretion. Leggett, 326 F.2d at 614.

Here, when the court learned of the violation of its sequestration order, it held a hearing to determine what Barrena and Evans said to each other. Both Barrena and Evans testified. According to both, Evans told Barrena why he chose to testify on behalf of the government. The two also discussed threats the defendants had made against them. Evans admitted that he discussed one brief aspect of his testimony with Barrena. Specifically, Evans told Barrena he had testified that although he (Evans) had heard that Barrena was a drug courier, he had never actually seen Barrena with drugs in his possession. Evans refused to discuss any other aspect of his testimony with Barrena. Defense counsel then asked that codefendant Escobar, who was in a nearby cell, be examined, but the court refused to take further testimony on the Rule 615 issue.

The district court found that Barrena's testimony would not be tainted by his conversation with Evans and, accordingly, denied the

7

defense motion to either declare a mistrial or to bar Barrena from testifying. The court did, however, permit defense counsel to cross-examine Barrena about his conversation with Evans in the holding cell. In addition, the court allowed the defense to argue to the jury that the sequestration order violation made Barrena's testimony unworthy of belief. We conclude that the corrective measures taken by the district court were adequate to cure what the court found to be a "very technical and very slight violation" that caused Cortina to suffer "no particular prejudice." The district court did not abuse its discretion in denying the motion for a mistrial and in allowing Barrena to testify.

V.

Cortina next claims that there was insufficient evidence to convict him on a count of conspiring to distribute cocaine in North Carolina. He argues that the evidence only proves that he gave cocaine to Barrena in Miami on one isolated occasion, with no intent on his (Cortina's) part that the drug be distributed elsewhere. Cortina also argues that because he never left Miami and had no idea cocaine would be distributed elsewhere, venue was improper in the Western District of North Carolina.

A.

A jury verdict must be upheld if there is "substantial evidence to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). The evidence must be viewed in the light most favorable to the government. Id. A defendant may properly be convicted of conspiracy if the evidence shows that "he join[ed] the conspiracy with an understanding of the unlawful nature thereof and willfully join[ed] in the plan on one occasion . . . even though he had not participated before and even though he played only a minor part." United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989).

The evidence established that Cortina was the source of large amounts of cocaine distributed in North Carolina. Barrena testified that packages of cocaine he received from Cortina were marked with the word, "Pepe," and law enforcement officers testified that they found cocaine packages marked "Pepe" in Lake Lure, North Carolina. In addition, Cortina's providing cocaine to Barrena on credit allows

8

the inference that Cortina knew that Barrena would later sell that cocaine. Finally, Cortina's statement to Barrena that Evans should sell the bad batch at reduced rates and that he (Cortina) would give Barrena and Evans a good deal on a future delivery indicates that Cortina not only knew that Evans was selling cocaine in North Carolina but that he intended that Evans do so. The evidence was sufficient.

B.

For similar reasons, venue was proper. A crime that is "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Once Cortina became a part of the conspiracy, he became liable for all acts of his co-conspirators undertaken in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 647 (1946). Ample evidence showed that Cortina was the source of cocaine distributed in Union and Mecklenburg Counties, North Carolina. Furthermore, the cocaine marked "Pepe" was found in Lake Lure, in Rutherford County, North Carolina, and was tied directly to Cortina through Barrena's testimony. Union, Mecklenburg, and Rutherford Counties are all within the Western District of North Carolina. 28 U.S.C. § 113(c). Venue was proper in that district because the evidence showed that Cortina's co-conspirators, Barrena, Escobar and Evans, all acted in furtherance of the conspiracy there. See Hyde v. United States, 225 U.S. 347, 367 (1912) ("the overt acts give jurisdiction for trial").

VI.

Cortina's conviction is affirmed.

AFFIRMED

9