**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ronald PORTIS, Defendant-Appellant.**

No. 76–1062.

United States Court of Appeals,
Seventh Circuit.

Argued June 18, 1976.
Decided Sept. 24, 1976.

Terence F. MacCarthy, Federal Defender Program, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U.S. Atty., Anne Bowen Poulin, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

Ronald Eugene Portis appeals from his conviction by a jury for robbery of a feder-

ally insured savings and loan association, 18 U.S.C. § 2113(a).[1] At trial Portis did not controvert the evidence of Government witnesses about the events which had led to his indictment. He relied entirely on a claim of insanity. The issues on appeal are concerned with this claim.

Midday on September 3, 1975, Portis went to teller Grace Maria Mika's counter in the First Federal Savings and Loan Association, Chicago, Illinois. He was not wearing a mask and his eyes were glassy and bloodshot. He was carrying a transistor radio in his left hand. Portis mumbled something to the teller; she could not understand him. He then tossed a brown paper bag and a note over the counter and directed Mika to read the note. It said "It life or death 5000." The teller kicked the alarm and began placing money in the bag. While she was doing this, Portis instructed her not to touch anything until he was out the door and repeatedly told her to be a good girl. He spoke in a low monotone. The teller put $8,400 in the bag.

When the alarm was set off, an assistant vice-president of First Federal, Raymond Kennedy, was notified that a robbery was in progress. He observed Portis at Mika's station, walked over, and, as the defendant turned to leave, Kennedy grabbed him from behind, said "Come with me," and marched him toward a private office. Portis asked him, "Why don't you leave me alone and get your hands off of me?" A security guard, with gun drawn, came to Kennedy's assistance. Portis tried to shrug off Kennedy's grip but offered no other resistance. In a few minutes, agents of the Federal Bureau of Investigation came and arrested the defendant.

On appeal, Portis maintains that the trial court erred (1) in refusing to allow him to introduce certain surrebuttal testimony by the defense's psychiatrist, (2) in permitting the Government's clinical psychologist to give his opinion on the question of Portis' sanity, (3) in refusing to instruct the jury

1. Portis was sentenced to four years in the custody of the Attorney General and was ordered to submit to psychiatric testing and treatment.

that in the event of acquittal by reason of insanity it could be presumed that the defendant's state of insanity continued and that it would be the responsibility of the Government to determine what should be done with the defendant, and (4) in denying defendant's motion to suppress a purported bank robbery note taken from Portis by a security guard at the Chicago Greyhound Bus Terminal on August 18, 1975, approximately two weeks prior to the offense charged in the indictment.

## I.

At trial, the principal issue was whether on September 3, 1975, Portis had been suffering from a mental disease or defect with the result that he lacked substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law. The Government in its case in chief relied on the presumption of sanity and simply put into evidence the events at the savings and loan association. Portis supported his defense of insanity with the testimony of two experts (a psychiatrist and a clinical psychologist) and several lay witnesses. The Government then called its rebuttal witnesses, including a psychiatrist and a psychologist. The major problem presented on this appeal is whether the peculiar order of proof followed in an insanity defense case coupled with certain trial court rulings deemed to be unduly restrictive denied Portis a fair trial.

The defendant clearly presented sufficient evidence to rebut the presumption of sanity. *Cf. United States v. Sennett,* 505 F.2d 774, 778 (7th Cir. 1974); *United States v. Bohle,* 445 F.2d 54, 70 (7th Cir. 1971). He argues that the psychiatrist whom he called on his behalf, Dr. Finkel, was improperly disallowed the opportunity to give crucial testimony—testimony explaining, controverting, and contradicting the evidence of the Government's psychologist and psychiatrist. Portis had attempted on direct examination of Dr. Finkel to elicit both general and detailed comments on and criticisms of the report made by the Government's psy-

chologist. The Government's psychiatrist had relied upon that report in part in making his own report. (The parties had exchanged medical reports prior to trial. In addition, pursuant to the defense's request, the Government had given the defendant copies of the psychological tests administered to Portis by the Government's psychologist.)

Dr. Finkel was allowed to testify that he had reviewed and was familiar with the psychological tests given Portis. However, when counsel tried to follow up this question, the court sustained an objection of the Government on the ground that it would be improper to impeach or contradict the testimony of a witness who had not yet testified. Defense counsel pointed out that this ruling would preclude the jury's hearing this critical evidence and asked that he be permitted to recall Dr. Finkel as a surrebuttal witness. The court refused this request.

[T]hat would be, in effect, giving you the last word in the trial. The Government has the privilege of rebuttal. If I permit you to do that, then they could make a plausible request to bring in more, and then we would never reach the point where we could equitably terminate the trial. . . . [Dr. Finkel] can [now, on direct examination] give his ultimate conclusion if he does not go into all of the details of the report . . . . [Y]ou may not go into specifics . . . . I agree with you [that] you will have no chance to do that with this witness, but somebody has to have the last word in a trial. When . . . the psychologist and psychiatrist for the Government . . . testify, you will have an opportunity to cross-examine. As of now, this witness can give general conclusions as to what he agrees with or disagrees with. He will not be permitted to go into the portions of the report to substantiate that testimony. . . . If [Dr. Finkel] states that he disagrees with the conclusions [in the psychologist's report], and you ask him why, I am not going to permit him to go into it. I am not going to permit him to go into the details of those reports.

Portis on appeal no longer presses his claim that he should have been allowed to elicit from Dr. Finkel on direct examination criticisms and explanations of the psychological tests and the psychologist's report. We agree that anticipatory impeachment and contradiction would here have been unwise. Among other aspects of the matter, anticipatory contradictory testimony would of necessity have had to be directed to examination reports. The testimony of the preparer of a report, even though based upon the report, might well have been broader or narrower and almost certainly would have had explicatory aspects. If the jury is to hear refuting testimony, it would ordinarily appear to be preferable that such testimony be directed toward actual testimony heard by the jury. That which will be heard must necessarily remain somewhat in the speculative area until it is articulated from the witness stand. Portis' argument in essence is that the trial court abused its discretion when it refused to allow surrebuttal testimony by Dr. Finkel.

Portis relies primarily on two cases to support this contention. In *United States v. Greene,* 497 F.2d 1068, 1083 (7th Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), the trial court had not permitted the mother of the defendant to testify on surrebuttal about the history of mental illness in the family. The possibility of a genetic base to schizophrenia had first been mentioned by a defense psychiatrist on cross-examination; later, the Government's doctor had said on cross-examination by the defendant that genetics may be important in schizophrenia, but that the doctor himself knew of no history of mental illness in the defendant's family. We held that the trial court had ruled properly:

> Assuming, *arguendo,* that the proposed testimony would be otherwise admissible, it was, nevertheless, offered too late. Surrebuttal evidence must meet and reply to evidence presented by the plaintiff in rebuttal. . . . [The mother's] testimony [if it had been substantial or significant] properly should have been

presented as part of the defense's case in chief.

*Id.* at 1083. Portis relies on the general remarks in *Greene* about surrebuttal. Portis did try to include the evidence in question in his case in chief; and, from counsel's remarks to the court and his offer to prove, it appears that the proposed evidence would have been in reply to evidence presented by the Government on rebuttal.

In *United States v. Sadler,* 488 F.2d 434 (5th Cir. 1974), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234, the other case relied upon by Portis, the appellate court rejected the defendants' contention that they should have been permitted to introduce evidence in surrebuttal to contradict and impeach the testimony of the Government's informer, who testified on rebuttal. In dicta, however, the court suggested that it would be proper to grant surrebuttal if and when Government rebuttal witnesses "go into new matter" or inject "fresh issues on which the defendant is denied the right to present evidence." *Id.* at 435. Trial courts should try efficiently to conclude a trial "when each side has had the opportunity to present his view of all issues fairly raised." *Id.*

As the Government points out, Portis was able to get before the jury some discussion of the psychological tests administered to him and of the inferences that the Government's psychologist had drawn from them. This was done not through the testimony of the defendant's principal expert witness, Dr. Finkel, but through the examination of the defense's psychologist, Dr. Paull. Portis complains that he nevertheless suffered great prejudice. The psychiatrist, as a medical doctor, could have handled in a better fashion the testimony of the Government's psychologist, and the psychiatrist was the only witness for the defense who could have dealt with the testimony of the Government's psychiatrist. Portis further argues that the Government's notion of "new matter," *see Sadler, supra,* is unreasonably narrow. All four experts did testify about the defendant's mental condition, but the issue of insanity is

allegedly too complex not to be treated as consisting of a group of important subissues.

We acknowledge the difficulty of balancing the interests of judicial economy and the right of a defendant to present as strong an insanity plea as he can. The trial court, however, should have given Portis more leeway and permitted him to recall Dr. Finkel in surrebuttal. Simply allowing the psychiatrist to state that he disagreed with the conclusions of the Government's experts was not sufficient. While permitting Dr. Finkel to testify that he disagreed with conclusions in the report of the Government's expert no doubt has some proficuous aspects for the defense, the jury's comprehension of the validity of the claim of insanity would be much more likely to be aided by knowing the why's and wherefore's of the disagreement rather than by merely being aware that there was a bare bones difference of opinion. The evidence by Dr. Finkel on surrebuttal would not have been mere repetition of his earlier testimony. In reversing Portis' conviction on this ground, we are not holding that a defendant pleading insanity must always be allowed to present surrebuttal evidence. Nor do we hold that Portis or any other defendant is entitled to "the last word."

We have not deemed it necessary to set forth the details of testimony as to the aberrant behavior of Portis at or near the time of the incident in question. The sufficiency of the evidence is not under direct challenge here. While there is substantial evidence supporting the plea of insanity, it is not our function to second guess the jury, but it *is* our concern to determine whether Portis did receive a fair trial on the issue. It has often been said that a litigant is not entitled to a perfect trial but only a fair trial; here we must conclude that there was a sufficient lack of fairness arising from the curtailment in the presentation of the crucial issue to require reversal.

We have spoken of the aspect of "new matter" or "fresh issues" justifying surrebuttal; here the trial court foreclosed the possibility of surrebuttal before it had been determined whether new matter would be developed in the testimony of the Government's expert witnesses. The language of the court in *United States v. Smith*, 507 F.2d 710, 712 (4th Cir. 1974), is appropriate:

> Undoubtedly, the trial court in its rulings was seeking to expedite the trial. This procedure is normally to be commended. But where the plea is insanity, the goal of expediting the trial must not be allowed to interfere with the defendant's right to develop fully and completely the many complex and often tenuous circumstances that may shed light on his plea.

We have confidence in the ability of the judges of the federal district courts to confine surrebuttal, or indeed sur-surrebuttal if that should ever become necessary, to its proper scope. The purpose, of course, is for the full development of the respective cases of the litigants, and gamesmanship in getting the last word should have no part in it. Here we have no reason for thinking that surrebuttal testimony would have unduly prolonged or delayed the trial.

As will be indicated hereinafter, there was a particular challenge to the competency as an expert of the Government's psychologist witness. The district court permitted the testimony on the basis that the challenge could go only to the weight of the testimony. In this situation it would appear particularly important that the jury should have adequate information to determine that weight, which essentially was what Portis was attempting to do by the proposed surrebuttal testimony. Finally, problems of order of proof should not be permitted to obscure the fact that the ultimate burden of proof of guilt, including soundness of mind, rests upon the prosecution.

Because the other matters raised by Portis on this appeal may recur on retrial, we will address ourselves to them.

## II.

 Portis asserts that the trial court "erred as a matter of law" in permitting Dr. Thomas White, a psychologist who testi-

fied on behalf of the Government, to express his opinion that Portis was legally sane at the time of the offense. Dr. White, the appellant contends, was not qualified to give an opinion on this important matter.

The record reveals the following. Dr. White has been awarded three degrees in psychology, a B.A., an M.A., and a Ph.D. He received the doctorate four months prior to Portis' trial. From August 1974 until July 1975, Dr. White held a one-year clinical internship at the internationally known Menninger Foundation, where he worked with patients in an outclinic. During this period, he also did some testing at the Federal Hospital for Prisoners in Springfield, Missouri; there, he worked closely with expert staff members. Before entering college, White had been trained by the Navy as a psychiatric technician and had worked for four years with persons suffering from psychiatric problems. He was, at the time of trial, a staff psychologist for the United States Bureau of Prisons at the Chicago Metropolitan Correctional Center, the first position he had held as a clinical psychologist. He had been at the Center for less than three months when he talked with and tested Portis. In November 1975, when Portis' trial took place, Dr. White was not a Diplomate of the American Board of Examiners in the Profession of Psychology nor could he have met the requirements established by the State of Illinois for certification as a psychologist. (Federal employees are not required to satisfy those criteria.)

In the Seventh Circuit, the test for insanity is based upon the definition formulated by the American Law Institute. *See United States v. Shapiro,* 383 F.2d 680 (7th Cir. 1967) (en banc). Portis does not claim that all psychologists are incompetent to give an opinion whether a defendant's conduct resulted from "a mental disease or defect." He acknowledges that courts have held that certain clinical psychologists, by virtue of their training and experience, may be competent to give a medical opinion as to sanity. *See, e. g., United States v. Riggleman,* 411 F.2d 1190 (4th Cir. 1969); *Jenkins v.*

*United States,* 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (en banc), referred to in our *United States v. Dellinger,* 472 F.2d 340, 382–83 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). In *Jenkins,* Judge Bazelon stated:

> We agree with the weight of authority . . . that some psychologists are qualified to render expert testimony in the field of mental disorder. . . . The test . . . is whether the opinion offered will be likely to aid the trier in the search for truth. In light of that purpose, it is hardly surprising that courts do not exclude all but the very best kind of witness. . . . The principle to be distilled from the cases is plain: if experience or training enables a proffered expert witness to form an opinion which would aid the jury, in the absence of some countervailing consideration, his testimony will be received.

*Jenkins* at 643–44 (footnote omitted). Judge Bazelon, for the court, held that the admissibility of a psychologist's opinion lay within the sound discretion of the trial court. "[T]he lack of a medical degree, and the lesser degree of responsibility for patient care which mental hospitals usually assign to psychologists, are not automatic disqualifications. Where relevant, these matters may be shown to affect the weight of their testimony, even though it be admitted in evidence." *Id.*at 646. At Portis' trial, the Court ruled that there was no legal barrier to the admissibility of Dr. White's testimony and that defense counsel's doubts regarding Dr. White's expertise were matters going to the weight to be accorded that testimony.

Portis points out that Judge Bazelon in *Jenkins* provided general guidelines for the exercise of discretion by a trial court and that concurring Judge Burger (now Chief Justice) recommended specific considerations. In the context of that case, it is understandable why the judges discussed at length possible criteria—not rigid criteria— that would qualify a psychologist as an expert on a defendant's mental condition at

the time of an offense.[2] The trial court in *Jenkins* had instructed the jury to disregard the testimony of three psychologists on the defendant's sanity at the time of the offense without scrutinizing the actual experience of the individuals and the probable probative value of their opinions. In the present case, the opinion of the psychologist was not excluded, and his *vita* shows that he fell within the middle range where an expert's credentials are not unquestionable but are sufficient that the court could, in the exercise of its discretion, permit the witness to state his opinion as an expert. *Contrast State v. Padilla,* 66 N.M. 289, 347 P.2d 312, 317–19 (1959), where the trial court erroneously accepted testimony from a psychologist who, unlike Dr. White, had no Ph.D., no post-graduate training, and no experience as an intern in a mental institution. Here, on both direct examination and cross-examination, counsel brought to the jury's attention the nature and extent of Dr. White's experience and education. Further, through the direct testimony of his expert witness Dr. Paull, a clinical psychologist, Portis criticized Dr. White's opinion and his alleged lack of adequate experience. The jury thus had all this information before it in determining the weight to be accorded Dr. White's opinion.

### III.

Portis believes that jurors are hesitant to acquit a defendant on the basis of his insanity because they fear an acquittal will turn loose on the community a person who may engage in further antisocial conduct. Portis argues that to ensure a fair trial for a defendant raising the defense of insanity, especially where, as in his case, the evidence of insanity is substantial, a jury instruction such as the following must be given upon counsel's request:

> If you acquit the defendant, it would be presumed that his state of insanity continues and it would be the responsibil-

ity of the government to determine the disposition to be made of him. Questions concerning such disposition, like questions relating to punishment in the event of conviction, are matters that should not be given any consideration by the jury.

The trial court below refused to give the jury this instruction, indicating in effect that it inadequately stated the law and that it could possibly confuse the jury.

Portis relies primarily on the dissenting opinion in *United States v. Greene, supra,* 497 F.2d at 1087, and on the opinion of Judges Prettyman and Burger in *Lyles v. United States,* 103 U.S.App.D.C. 22, 254 F.2d 725, 728 (1957) (en banc), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). Portis recognizes that federal courts do not as a rule give such an instruction and that the situation in the District of Columbia differs from that here because of the applicability to the District of Columbia of 24 U.S.C. § 211. He suggests, however, that to ensure fairness, we require, without waiting for congressional action, trial courts in this circuit to give the instruction. District court judges allegedly have the "inherent power" to see to compliance with such an instruction.

In *Greene,* the majority, although reserving judgment on the approach suggested in the dissent, expressed disapproval of that approach. We commented that it was "arguable whether it would have been erroneous for the district court to have declined to have given an instruction patterned on the suggestions of the dissenting opinion had such a request been made." *Greene* at 1077. We were reluctant to adopt the "perilous course of speculating" whether a jury verdict was motivated by beliefs not based upon anything brought out in evidence nor adverted to in an instruction, and we quoted Professor Abraham Goldstein's observation that "the more common view is that it is improper to give the instruction because it would distract the jury from the insanity

---

**2.** Rule 702 of the Federal Rules of Evidence, we note, speaks in broad terms:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

issue and would invite compromise verdicts." *Id.* at 1076, 1077. We adhere to these views. As the trial court below remarked, the instruction proposed by Portis implies that the defendant would be confined if he were acquitted by reason of insanity. The instruction, which speaks in terms of the Government's responsibility (and not of the trial judge's, as the defendant at times argued on appeal), suggests that the disposition of the defendant upon such an acquittal would be within the control of the prosecutor. No legal basis exists for that proposition. *Cf. Greene* at 1077: "It appears to us that a trial court would indeed be engaging in unwarranted judicial activism to attempt to instruct the jury as to the status of the federal defendant found not guilty by reason of insanity when there is such a complete lack of guidelines to determine just what the disposition would be." Finally, the record discloses that, in the course of the trial, Portis' involuntary commitment to Manteno State Hospital in 1968 was amply discussed; it would seem unlikely that a jury hearing such evidence would necessarily assume that a perhaps dangerous and mentally ill person would automatically be left free to inflict harm on the community.

## IV.

In its rebuttal, the Government introduced into evidence what appeared to be a bank robbery note found on Portis by security guards at the Chicago Greyhound Bus Terminal on August 18, 1975. The appellant contends that there was sufficient state involvement in the search to invoke the protection of the Fourth Amendment and that probable cause for Portis' arrest at that time was lacking. The Government had brought in this matter supposedly to show the defendant's intent, by prior similar acts.

At oral argument, the Government stated that, in light of the defense Portis adopted and the testimony as to his periodic bouts of mental problems, the Greyhound Bus Terminal incident was not very probative evidence, probably did not need to have been introduced, and undoubtedly did not contribute to the jury's verdict of guilty. It seems unlikely, therefore, that the Government on retrial will offer this evidence again. If it does, however, and the trial court rules that there are no constitutional barriers to the admission of the evidence, the court should make certain that the prejudicial effect of the evidence does not outweigh its probative value. *See, e. g., United States v. Fearns,* 501 F.2d 486, 491 (7th Cir. 1974); *United States v. Fierson,* 419 F.2d 1020, 1022 (7th Cir. 1969).

For the reasons set out in this opinion, the judgment of conviction is reversed, and the cause is remanded to the district court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.