**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Terrance FRANK, Defendant–Appellant.**

No. 89–10289.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 1991.

Decided June 3, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 11, 1992.

Jon M. Sands, Asst. Federal Public Defender, Phoenix, Ariz., for defendant-appellant.

Linda A. Akers, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before HUG, ALARCON and WIGGINS, Circuit Judges.

ALARCON, Circuit Judge:

Terrance Frank appeals from the judgment of conviction entered following trial by jury, on two counts of second degree

murder in violation of 18 U.S.C. § 1111 and § 1153, two counts of assault with intent to commit murder in violation of 18 U.S.C. § 113(a) and § 1153, and four counts of use of a firearm in commission of a crime of violence in violation of 18 U.S.C. § 924(c) and § 1153. Frank was sentenced to prison for 35 years.

The facts presented by the Government at the guilt phase of this matter were uncontroverted. Frank was 24 years old at the time of the charged offenses. He fatally shot Eugene George and Irvin Harvey. Frank also shot and wounded Esther Harvey, and Louis Harvey. The crime occurred on June 24, 1988, at the Harvey family residence located in a remote part of the Navajo Indian Reservation in Arizona.

Frank was indicted on July 13, 1988. On September 23, 1988, Frank requested a hearing to determine whether he was competent to stand trial. The district court appointed two psychiatrists and a psychologist to assist defense counsel for the competency proceedings. Frank was also examined by a Government psychiatrist and psychologist. Each expert testified regarding Frank's competency. A hearing was also held on Frank's motion to suppress the statement he gave to an FBI agent.

On appeal, Frank seeks reversal on the following grounds:

    1. The district court erred in finding Frank competent to stand trial.

    2. The district court erred in denying Frank's motion to suppress his confession.

    3. The district court erred in rejecting Frank's proposed jury instruction on the effect of a verdict of not guilty by reason of insanity.

We conclude that these contentions lack merit and affirm. We address each of these issues and the facts pertinent thereto under separate headings.

## DISCUSSION

### I. COMPETENCY DETERMINATION

Frank contends that "in light of the overwhelming evidence to the contrary," the district court's finding that he was legally competent to stand trial constituted clear error. Appellant's Opening Brief at 21. Frank refers this court to the testimony of defense witnesses to support his contention that he was unable to concentrate or assist counsel in his defense because he is mentally retarded and suffers from severe depression. The Government's experts disagreed. They testified that there was no evidence that Frank was mentally retarded or that he suffered from severe depression at the time of their examination. Each prosecution expert was of the opinion that Frank was able to understand the nature and the consequences of the criminal proceedings against him and to assist his counsel in the preparation of a defense.

The district court concluded that the Government met its burden of proving that Frank was competent. The court found that Frank was oriented as to time, place, and person, and was not presently suffering from a mental disease or defect. In explaining its ruling on the competency motion, the district court stated:

    The defendant understands the charges against him and the possible consequences if he is found guilty. He has some understanding of the roles of the prosecutor, defense counsel, and the judge. He has very little understanding of his constitutional rights, but this is not so much the result of mental incompetency as cultural differences.

    The defendant is able to assist his counsel in the preparation of a defense.

A defendant is incompetent to stand trial if the court finds "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense...." 18 U.S.C. § 4241(d)

■ A district court's finding that a defendant is competent to stand trial is a question of fact which we review for clear error. *United States v. Lindley*, 774 F.2d 993 (9th Cir.1985). We are required to consider the evidence in the light most favorable to the Government. *United States*

v. *Carlson,* 617 F.2d 518, 523 (9th Cir. (citing *United States v. Glover,* 514 F.2d 390, 391 (9th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975)), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980); *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974).

■ The test that must be applied in determining competency to stand trial is set forth in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). There the Court held:

> [I]t is not enough for the district judge to find that "the defendant [is] oriented to time and place and [has] some recollection of events," but that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

*Id.* at 402–03, 80 S.Ct. at 788–89 (citations omitted). *Accord, De Kaplany v. Enomoto,* 540 F.2d 975, 979 (9th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977). The Government has the burden of demonstrating by a preponderance of the evidence that the defendant is competent to stand trial. *United States v. Hutson,* 821 F.2d 1015, 1018 (5th Cir. 1987).

■ We have examined the record to determine whether the district court's findings are supported by the evidence in the record.

Dr. Jeffrey Harrison, a psychologist, testified that "Mr. Frank is able to assist his attorney at this time, that he is able to with education from his attorney understand the proceedings, and that there is no significant mental illness that would interfere with his ability to assist and understand the proceedings." He stated that although Frank suffered from depression, this condition did not interfere with his ability to recall the facts surrounding the case, or his awareness of the wrongfulness of his actions.

Dr. Alexander Don, a psychiatrist, testified that while Frank's intelligence was "low average," he was able to relate the charges against him and the identity of the victims. Frank was also able to give a detailed account of the events surrounding the offense. Dr. Don concluded that while Frank suffers from a relatively mild depression, "that would not qualify as a disease sufficient to interfere with his ability to communicate with his attorney.... Absent therefore a significant mental disease, and absent a significant mental defect, there is no medical psychiatric reason why he should not be able to communicate adequately with his attorney and assist him."

The record also shows that Frank speaks and understands English. His school records establish that he attended school for 10 years without behavioral problems.

The district court rejected the testimony of the defense experts that Frank was incompetent as a result of major depression, mental retardation, or borderline intelligence. In performing its fact-finding and credibility functions, a district court is free to assign greater weight to the findings of experts produced by the Government than to the opposing opinions of the medical witnesses produced by the defendant. *See United States v. Lindley,* 774 F.2d 993 (9th Cir.1985) ("The district court did not clearly err in assigning more weight to the findings of [the government's] psychiatrists than to the contrary conclusion of a psychiatrist retained by the defense.") Clear error is not demonstrated by pointing to conflicting evidence in the record. The record demonstrates that the district court did not clearly err in its finding that Frank was competent to stand trial.

## II. ADMISSIBILITY OF THE CONFESSION

Frank challenges the admission of his confession at trial on discrete constitutional grounds. He argues that his confession was involuntary because of his defective mental condition, his low I.Q., and "his unsophistication and unfamiliarity with the criminal justice system made him vulnerable to suggestion." Appellant's Opening

Brief at 25. Frank also contends that because he lacked the mental capacity to comprehend his constitutional rights, he did not knowingly and intelligently waive his right to remain silent and to have counsel present during police interrogation.

We review a district court's finding that a defendant waived his *Miranda* rights under the clearly erroneous standard. *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir.1988) (citing *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986)). *Accord, United States v. Doe*, 819 F.2d 206, 209 (9th Cir.1986) (Whether defendant knowingly and voluntarily waived his *Miranda* rights is essentially a factual inquiry reviewed under the clearly erroneous standard.) We consider the evidence on appeal in the light most favorable to the Government. *United States v. Walker*, 576 F.2d 253, 256 (9th Cir.1978), *cert. denied*, 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 51 (1979).

■ An involuntary or coerced confession is inadmissible. *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). A voluntary confession is inadmissible if the accused lacks the mental capacity to make a knowing and intelligent waiver of the right to remain silent and the right to counsel during police interrogation. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1985) ("[W]aiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.").

■ The district court denied Frank's motion to suppress his confession after hearing the testimony of an FBI agent and two Navajo Tribal Police Officers and considering the evidence presented during the competency proceedings. The district court explained its holding as follows:

> Well on the basis of the evidence that was presented at the previous hearing which related to the defendant's competency to stand trial, and the evidence that's been presented today, I'm satisfied that the defendant was properly given his Miranda warnings and that he certainly understood that he did not have to talk to the officers and that he waived those rights.

Our task is to determine whether the court's findings are supported by the record. The record does not support Frank's contention that the officers made improper suggestions that induced him to confess involuntarily because of his mental condition and impaired intellectual capacity.

The record shows that Sergeant Stephen White of the Navajo Tribal Police advised Frank of his constitutional rights when he was taken into custody at his home at 1:40 p.m. on Sunday, June 26, 1988. Sergeant White testified that Frank made no response to the reading of his rights. Sergeant White "told him to be quiet. I wasn't going to talk to him anyway." Frank was initially transported to the Navajo Tribal Police Station in Shiprock, New Mexico. There he was served dinner and examined by paramedics. No injuries were observed. Frank did not complain of pain. Frank was not interrogated at the Shiprock Navajo Tribal Police facility.

Kee Shaggy, Supervisor of the Detention Section at the Navajo Tribal Police station in Shiprock, New Mexico, testified that during the booking process, Frank stated that he had shot some people. Shaggy told Frank to be "[q]uiet." Sergeant White was requested by Special Agent John Raucci of the Federal Bureau of Investigation to transport Frank to the Navajo Tribal Police jail facility in Window Rock, Arizona.

Shortly after 7:00 p.m. that evening, Special Agent Raucci interviewed Frank at the Navajo Tribal Police Headquarters in Window Rock. Special Agent Raucci began his interrogation by inquiring whether Frank understood why he was being interviewed. Frank replied that he did. Special Agent Raucci then asked Frank whether the Navajo Tribal Police advised him of his rights. Frank replied that they had told him "you have the right to remain silent." Special Agent Raucci then told Frank that he was going to speak to him about the shooting on June 24th and read aloud the FBI Interrogation and Advice of Rights Form. After reading Frank his rights, Special Agent

Raucci asked Frank to read the form himself. Frank was then asked to read the waiver of rights portion of the form out loud.

Special Agent Raucci testified that Frank appeared to read well. Frank read the form out loud without any obvious difficulty. When Frank paused at the word "coercion," Sergeant John Begay, of the Navajo Tribal Police, explained to Frank that coercion "means when the police try to force you into doing something that you don't want to do." Frank told the officers that he understood his rights and signed the waiver form.

Special Agent Raucci characterized Frank as being very cooperative. Frank did not request that the interview be terminated. Special Agent Raucci testified that no threats or promises were made to Frank. Frank appeared to be alert and to understand the questions asked of him at all times.

The testimony presented by the Government shows that Frank was treated properly by the police before and during the interrogation, and was not subjected to coercion. There is no evidence in the record of police overreaching or oppressive conduct that caused Frank to confess involuntarily. If anything, the record shows the officers where fully respectful of his constitutional rights. In fact, one of the officers told Frank to be quiet when he volunteered during booking that had committed violent acts. The district court did not err in concluding that Frank confessed voluntarily.

▇ Frank contends that testimony at the competency hearing presented by the Government established that he was unable to comprehend his *Miranda* rights. The test we must apply in determining whether a waiver of *Miranda* rights was knowing and intelligent is set forth in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1985).

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421, 106 S.Ct. at 1141 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)). When considering the totality of the circumstances, relevant factors include "age, experience, education, background and intelligence. . . ." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).

As discussed above, there is no evidence in the record that Frank was intimidated, coerced, or deceived by the police. Frank argues that the testimony at the *competency* proceedings demonstrates that he did not understand his rights to remain silent and to counsel during police interrogation. This argument is misleading. The Government's experts testified that Frank had "limited understanding" of the rights that are implicated in entering a plea of guilty.

In his opening brief Frank quotes the following portion of his attorney's cross-examination of Dr. Jeffrey Harrison, a psychologist who testified as a Government witness:

Q. You also stated, I believe, that Terry didn't understand what his rights were, his right to remain silent.

A. I believe he had a limited understanding of that.

Q. So he was basically just parroting his rights?

A. No, I don't believe so. I think what he was unable to state to me he did understand.

Q. But he had a limited understanding?

A. Yes.

Q. Which means not a full comprehension of his rights?

A. Yes, for a very good reason.

On redirect examination, Dr. Harrison explained to the court that Frank's limited

understanding of the constitutional rights that are lost when a person pleads guilty, was not the result of "intellectual impairment." Instead, it was caused by the fact that as a Navajo who had lived on a reservation all his life, Frank had not been educated about the American system of justice.

Frank also quoted portions of the testimony of Dr. Alexander Don, a psychiatrist who was called by the Government, to support his argument that he did not "comprehend his constitutional rights." On cross-examination, Dr. Don was asked if Frank was "unable to comprehend a waiver of his constitutional rights." Frank's defense counsel clarified his query in the following colloquy:

A. I am not sure I know what you mean when you use the word comprehend.

Q. He didn't know what they meant?

A. He didn't know what they meant, correct.

Q. Especially the right to remain silent, or that was one right that you told him?

A. Correct.

The distinction between *knowing* the meaning of terms used in the United States Constitution, and a lack of mental capacity to *comprehend* them was significant to the district court in this matter because of the fact that Frank is a Navajo who lives in a hogan in a remote part of an Indian reservation.

Shirley Jensen, who was called as a defense witness, testified that she was a district court interpreter for persons who speak the Navajo language. Jensen acted as the interpreter during one of Dr. Don's examinations of Frank. Jensen explained that there are some words in the English language that do not have a Navajo equivalent term. For example, there is no word for "guilty." Two or three sentences are required to explain the meaning of this word. Jensen also explained that the words "prosecutor" and "defense attorney" are not part of the Navajo vocabulary. In translating the word "prosecutor" the interpreter testified that she uses the Navajo words for "Washington" attorney. The term defense attorney is translated as

"somebody that negotiates or that speaks for you...."

Frank testified during the competency proceeding. On cross-examination he testified that a defense lawyer is someone who helps you. He also stated that a prosecutor does not help you. We agree with the district court that the record demonstrates that Frank's limited understanding of the terms used in the United States Constitution was "not so much the result of mental incompetency as cultural differences." The record supports the court's finding that Frank understood the words "remain silent" and that he did not have to talk to the officers. In fact, when asked by Special Agent Raucci whether he had been advised of his rights, Frank replied that the Navajo Tribal Police had done so that date. Before any explanation of his rights was recited by Special Agent Raucci, Frank volunteered, "you know, you have the right to remain silent." The district court did not clearly err in concluding that Frank had the mental capacity to comprehend his right to remain silent and to counsel at a police interrogation, and the consequences of the giving up these constitutional guarantees.

III. INSTRUCTION ON THE CONSEQUENCES OF A VERDICT OF NOT GUILTY BY REASON OF INSANITY

■ Frank submitted a proposed jury instruction on the consequences of a jury verdict of not guilty by reason of insanity. Defendant's Requested Jury Instruction No. 19 reads in its entirety:

If you find Mr. Frank not guilty by reason of insanity, the law requires that he be committed to a suitable facility until such time, if ever, that the Court finds he may safely be released back into the community.

The court refused to give the instruction. No similar instruction was given. Frank contends that under the Insanity Reform Act of 1984, 18 U.S.C. §§ 4241–4247, the district court was required to give an instruction on the consequences of a verdict of not guilty by reason of insanity.

There is a split of authority in this circuit as to whether the refusal to give a proposed jury instruction is reviewed for abuse of discretion, or *de novo*. *United States v. Slaughter*, 891 F.2d 691, 699 (9th Cir.1989). We do not attempt to resolve this conflict in this matter because we conclude that the district court's ruling would not be erroneous under either standard.

It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict. In *Miller v. United States*, 37 App. D.C. 138 (1911), the court summarized this principle in the following words:

> While it is permissible for the trial court to caution the jury not to be influenced by the probable consequences of their verdict, as all responsibility after the verdict is with the court, it is error for the court to put before the jury any considerations outside the evidence that may influence them, and lead to a verdict not otherwise possible of attainment. The deliberations of the jury should revolve around the evidence before them, and should be uninfluenced by other considerations or suggestions. The moment other suggestions or considerations find lodgment in their minds, that moment they stray from the path which the law has marked out, and their verdict, in consequence, does not rest solely upon the evidence.

*Id.* at 143. *See also, United States v. Greer*, 620 F.2d 1383, 1384–85 (10th Cir. 1980) ("Absent a statutory requirement that the jury participate in the sentencing decision, nothing is left 'for jury determination beyond the guilt or innocence of an accused.'") (citation omitted); *United States v. McCracken*, 488 F.2d 406, 423 (5th Cir.1974) ("Except where a special statutory provision mandates a jury role in assessment or determination of penalty, the punishment provided by law for offenses charged is a matter exclusively for the court and should not be considered by the jury in arriving at a verdict as to guilt or innocence."); *United States v. Davidson*, 367 F.2d 60, 63 (6th Cir.1966) ("It is axiomatic that it is the exclusive function of juries to determine whether defendants are guilty, and of the court to determine matters of punishment.").

As explained by the Fifth Circuit in *Pope v. United States*, 298 F.2d 507 (1962):

> To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for parole, *or other matters relating to disposition of the defendant*, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.

*Id.* at 508 (emphasis added).

It is the practice in the federal courts to instruct juries that they are not to be concerned with the consequences to the defendant of the verdict, except where required by statute. *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (jury should have been admonished "that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed"). *See e.g., United States v. Reed*, 726 F.2d 570, 579 (9th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984); *United States v. Briscoe*, 574 F.2d 406, 408 (8th Cir.1978) ("The penalty to be imposed upon a convicted defendant is generally not a matter for the jury, and it is proper to caution the jury against any consideration of possible punishment in their deliberations."), *cert. denied*, 439 U.S. 858, 99 S.Ct. 173, 58 L.Ed.2d 165 (1978). *Accord, United States v. Craig*, 477 F.2d 129, 131 (6th Cir.1973); E. Devit & C. Blackmar, *Federal Jury Practice and Instructions*, § 18.02 (3d ed. 1977).

In 1957, the District of Columbia Circuit created an exception to the rule that a jury should not be informed of the consequences of a verdict in cases involving a plea of not guilty by reason of insanity in *Lyles v. United States*, 254 F.2d 725 (D.C.Cir.1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

The court in *Lyles* held that where an insanity defense is asserted, the jury should be instructed as to the consequences

of a finding of not guilty by reason of insanity because "[w]e think a jury has the right to know the meaning of this possible verdict as accurately as it knows by common knowledge" that "a verdict of not guilty means that the prisoner goes free and a verdict of guilty means that he is subject to such punishment as the court may impose." *Id.* at 728. No other circuit has adopted the *Lyles* doctrine since it was published in 1957.

Nine years after the *Lyles* decision was published, we held in *Evalt v. United States*, 359 F.2d 534 (9th Cir.1966), that a jury should not be informed of the consequences of a verdict of not guilty by reason of insanity. We stated in *Evalt:*

> In cases such as this, where the jury has nothing to do with fixing the penalty, the jury's sole concern is guilt or innocence. It should not concern itself with what punishment the defendant may receive, or whether, if acquitted, he would or would not "walk out of this courtroom a free man" or whether they would "turn this man loose again on society."

*Id.* at 546.

In *Evalt*, defense counsel asked the prosecutor, in the presence of the court, to stipulate that the jury be admonished that there was "psychiatric treatment available from the Navy in the event he was found not guilty by reason of temporary insanity." *Id.* at 544. The court stated that it would "forbid either counsel to touch or dwell on the [availability of psychiatric treatment in the Navy]." *Id.* at 545. The prosecutor then requested the court's permission to argue to the jury that the defendant would walk out of the courtroom a free man. The court granted this request. In his closing argument, the prosecutor stated: "If you find him not guilty, he walks out of this courtroom a free man and I know, ladies and gentlemen, that you are not going to turn this man loose on society." *Id.*

We stated in *Evalt* that the court erred in permitting the prosecutor to argue about the effect of a finding of not guilty by reason of insanity. *Id.* at 547. In arriving at this decision, we expressed our adherence to the general rule.

> We agree with the view of California Supreme Court [in *People v. Morse,* 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964)] where it quoted with approval from *State v. White,* 1958, 27 N.J. 158, 142 A.2d 65 as follows:
> The jurors perform their task completely when they decide the matter assigned to them upon the evidence before them *what happens thereafter is of no concern of theirs.'*

*Id.* at 547 n. 16 (emphasis added).

We reversed in *Evalt* because the court permitted the prosecutor to comment about the effect of the verdict while precluding defense counsel from commenting that psychiatric treatment would be available in a Navy facility. *Id.* at 546. We held that "[t]he court should have imposed the same restriction as to the effect of not guilty as it imposed upon the defense." *Id.* The effect of the failure to do "was to tilt the scales in the government's favor." *Id.*

"Frank's reliance on this court's decision in *People of Guam v. Garrido,* 752 F.2d 1378 (9th Cir.1985) is misplaced. In *Garrido,* the trial court refused to instruct the jury that if the defendant were found guilty by reason of insanity,

> ... it would be the duty of the court to determine, on the basis of evidence given at trial or at a separate hearing, whether to order the defendant committed to the Administrator of the Guam Memorial Hospital.

*Id.* at 1380.

The defendant in *Garrido* argued that this court should reverse the district court based on the Second Circuit's decision in *Lyles.* In rejecting this argument, we held that the instruction did not contain an accurate statement of the consequences of a finding of not guilty by reason of insanity. *Id.* We did not adopt the District of Columbia Circuit's rule in *Lyles,* nor did we purport to overrule the law of this circuit as set forth in *Evalt.*"

In this matter, the district court followed the law of this circuit as explained in *Evalt*, by refusing to instruct the jury on a matter

of "no concern" to the jury, i.e., the effect of a finding of not guilty by reason of insanity. *Id.* at 547, n. 16. Unlike the evidence of prosecutorial misconduct presented to this court in *Evalt,* Frank has failed to demonstrate that an instruction on the effect of a verdict of not guilty by reason of insanity was required in this matter to prevent a "tilt of the scales." The prosecutor in this matter made no comment concerning the effect of a finding of not guilty by reason of insanity.

Frank concedes that with the exception of the District of Columbia Circuit, those circuits which have considered the question have "refused to require trial courts to instruct the jury that the defendant would be subject to a civil commitment if found not guilty by reason of insanity." Appellant's Opening Brief at 27.

Frank contends that this three judge panel should reject the law of the circuit and should adopt a new rule that would require district courts to instruct the jury concerning the effect of a finding of not guilty by reason of insanity. He argues the jury should be so informed because the passage of the Insanity Defense Reform Act of 1984 provides that a dangerous insane person must be committed to a mental hospital. Appellant's Opening Brief at 29 (citing 18 U.S.C. § 4243). Prior to the passage of the Insanity Defense Reform Act, a defendant found not guilty by reason of insanity was not subject to federal commitment to a mental hospital, except in the District of Columbia. *McCracken,* 488 F.2d at 416. The Insanity Defense Reform Act provides for a comprehensive commitment procedure for persons found not guilty by reason of insanity. 18 U.S.C. § 4243.

The statute does *not* provide that a jury must be instructed regarding the consequences of a finding of not guilty by reason of insanity under the Insanity Defense Reform Act. No reference is made in the statute to the subject of jury instructions. Frank argues that "Congress fully intended a jury to be informed that its verdict would not free a defendant into the community at large." Appellant's Opening Brief at 29.

Frank has failed to cite any language in the statute that expresses Congress' intent that a jury must be informed of the consequences of a finding of not guilty by reason of insanity. In interpreting the reach of a statute, we must look to plain meaning of words used by Congress. If the statute is unambiguous our inquiry must stop. *Valentine v. Mobil Oil Corp.,* 789 F.2d 1388, 1391 (9th Cir.1986) ("Where, as here, the statutory language is clear and its provisions can be construed in a consistent and workable fashion, resort to legislative history ... is inappropriate."). Congress knows how to create a new rule when it believes it appropriate to do so. *See e.g., Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 106, 108 S.Ct. 404, 411, 98 L.Ed.2d 415 (1987) ("Congress knows how to authorize nationwide service of process when it wants to provide for it."). Frank's only support for his argument that Congress intended that juries be instructed concerning the consequences of a verdict of not guilty by reason of insanity is the following observation in the Senate Committee report:

> The Committee endorses the procedure used in the District of Columbia whereby the jury, in a case in which the insanity defense has been raised may be instructed on the effect of a verdict of not guilty by reason of insanity. If a defendant requests that an instruction not be given, it is within the discretion of the court whether to give it or not.

No. 98–225, 98th Cong., 2d Sess. *reprinted* in 1984 U.S.Code Cong. & Admin.News 3182, 3423.

This statement does not have the force of law nor does it purport to interpret or explain ambiguous language in the statute regarding jury instructions. *See International Brotherhood of Electrical Workers Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987) ("While a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an *independent statutory source having the force*

*of law.... * [C]ourts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point." (emphasis in original) (citations omitted)). In the absence of an intervening Supreme Court decision or an Act of Congress that nullifies Ninth Circuit precedent, we must adhere to the law of the circuit as explained in *Evalt. LeVick v. Skaggs Companies, Inc.,* 701 F.2d 777, 778 (9th Cir.1983).

It was no concern to the jury in this matter, under the law of this circuit, that the Insanity Defense Reform Act provides for the commitment of a defendant to a suitable facility if he is found not guilty by reason of insanity. Because no reference was made in the presence of the jury of the consequences of a verdict of not guilty by reason of insanity, the district court did not err in rejecting the instruction proposed by Frank.

AFFIRMED.

HUG, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I and II of the majority's opinion. On the question of whether an instruction on the consequences of a verdict of not guilty by reason of insanity should be given when requested by a defendant, I disagree with the majority's analysis and conclusion. Therefore, I dissent from Part III of the opinion.

Terrance Frank requested a jury instruction that would have informed the jury of the consequences of a verdict of not guilty by reason of insanity. The district court denied his request. The majority opinion affirms by relying on Ninth Circuit law that is not on point and that pre-dates the passage of the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 4241–4247. Because this is a case of first impression, however, this court is not bound by pre-Act law on this question.

Prior to the Insanity Defense Reform Act, no federal legislation was in place for commitment of federal court defendants who were found not guilty by reason of insanity. Those defendants were released automatically, and federal officials relied upon states to pursue commitment proceedings. *See United States v. McCracken,* 488 F.2d 406, 416–17 (5th Cir.1974). Most federal circuits refused to allow trial courts to instruct juries on the consequences of a verdict of not guilty by reason of insanity. *See United States v. Portis,* 542 F.2d 414, 420–21 (7th Cir.1976); *United States v. Alvarez,* 519 F.2d 1036, 1047–48 (3d Cir.1975); *McCracken,* 488 F.2d at 425; *United States v. Borum,* 464 F.2d 896, 900–01 (10th Cir.1972); *Pope v. United States,* 372 F.2d 710, 731 (8th Cir.1967), *vacated on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *United States v. Evalt,* 359 F.2d 534, 546 (9th Cir.1966). The District of Columbia Circuit, however, requires an instruction on the consequences of the insanity verdict, unless the defendant requests otherwise, because the statutory code of the District of Columbia since 1955 has provided for mandatory commitment proceedings for defendants acquitted by reason of insanity. *See Lyles v. United States,* 254 F.2d 725, 728 (D.C.Cir. 1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

The Insanity Defense Reform Act of 1984 created a comprehensive evaluation and commitment procedure for federal court defendants outside of the District of Columbia who are found not guilty by reason of insanity. *See* 18 U.S.C. § 4243. The Senate Committee on the Judiciary endorsed the District of Columbia practice of allowing an instruction on the effect of the insanity verdict. S.Rep. No. 98–225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3422.

The Act itself does not require a jury instruction of any sort. No other circuit has considered this question since the enactment of the Reform Act. *But see United States v. Neavill,* 868 F.2d 1000 (8th Cir.), *vacated, reh'g en banc granted,* 877 F.2d 1394 (8th Cir.), *appeal dismissed,* 886 F.2d 220 (8th Cir.1989) (dismissed upon request of defendant; original opinion held that defendant was entitled to the instruction because of the Act).

The majority refers first to the sanctity of separation between judge and jury func-

tions. The argument, however, that an instruction on the consequences of a verdict of not guilty by reason of insanity violates that sanctity and impedes the function of the jury, is flawed. A jury's performance of its function is distorted when jurors fear that an insane defendant will be released into society if acquitted.

The sole function of the jury is to consider the evidence to determine whether the defendant is guilty or not, and the appropriate punishment of a guilty defendant is a matter solely for the judge to determine. Juries in federal courts generally are instructed that they should not consider the consequences of the verdict. *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975). The instruction is designed to protect the jury from being distracted from its function of judging the facts, from being tempted to compromise its verdict, and from confusing the issues to be decided. *See Pope v. United States*, 298 F.2d 507, 508 (5th Cir.1962), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965). The jury should base its verdict on the facts presented at trial, rather than on speculation about the effect of a given verdict on the defendant and on society.

In theory, the instruction preserves the traditional role of the jury. Jurors are unlikely to speculate about the consequences of a verdict of guilty or not guilty; jurors know that one will result in punishment and the other in freedom for the defendant. When the jury has a third option, however, to find a defendant not guilty by reason of insanity, the usual instruction is not adequate. Jurors do not know what the effect of that verdict may be, and may believe incorrectly that the defendant will go free even if he poses a danger to society.

The majority incorrectly assumes that the jury will not speculate about the consequences of a verdict of not guilty by reason of insanity if an instruction about the consequences is not given. Juries can and do speculate about the consequences. The jury foreperson in Terrance Frank's trial admitted after the trial that the jurors had been afraid that Frank would be released if found not guilty by reason of insanity. Evidence presented at trial had shown that Frank, who had shot four people, killing two and seriously wounding the other two, posed a danger to the community.

The concerns of Frank's jury are not isolated. One empirical study of juries conducted by the University of Chicago Law School showed that jurors' concern with what will be done to the defendant if he is acquitted by reason of insanity is "one of the most important factors in jury deliberations." *See* Weihofen, *Procedure for Determining Defendant's Mental Condition Under the American Law Institute's Model Penal Code*, 29 Temp.L.Q. 235, 247 (1956).

Many state courts have acknowledged that juries are concerned with the effects of a verdict of not guilty by reason of insanity. *See, e.g., People v. Cole*, 382 Mich. 695, 172 N.W.2d 354, 366 (1969); *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031, 1032 (1979); *Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294, 299 (1975); *State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595, 603 (1976). Jurors often conclude that such a verdict simply sets free defendants who pose dangers to society. A majority of states require or allow the court to give an instruction on the consequences of a verdict of not guilty by reason of insanity. *See* Annot., 81 A.L.R.4th 659 (1990); *The Not Guilty by Reason of Insanity Verdict: Should Juries Be Informed of Its Consequences?*, 72 Ky.L.J. 207, 211–12 (1983).

Contrary to the majority's argument, an instruction on the consequences of the verdict preserves, rather than taints or disrupts, the traditional bifurcated proceedings. It serves the same function as an instruction that sentencing is within the sole discretion of the judge. Failure to give an instruction about the legal consequences of a verdict of not guilty by reason of insanity, when the law requires mandatory commitment proceedings, may have the effect of inducing a guilty verdict. The instruction correctly informs the jurors that the defendant will be incarcerated or

hospitalized subject to findings by the court and by medical doctors. Jurors know the consequences of verdicts of guilty and not guilty. An instruction on the consequences of a verdict of not guilty by reason of insanity levels the field for the defendant and frees the jurors from their natural concerns about the protection of society so that they may focus on the facts and perform their duty.

No Ninth Circuit precedent precludes us from finding that an instruction on the consequences of a verdict of not guilty by reason of insanity should be given. The majority relies on *Evalt v. United States*, 359 F.2d 534 (9th Cir.1966). The holding in *Evalt*, however, only barred an inaccurate and prejudicial statement made by a prosecutor. *Id.* at 545–46. No tilting of the scales by prosecutorial misconduct is alleged by Frank. Rather, the scales are tilted by the court's refusal to allow an instruction on the legal consequences of the verdict, which allows the Government to capitalize, however tacitly, on the uncertainty and fear in the minds of jurors who consider the insanity verdict. This undermines the purpose of the insanity verdict.

The insanity defense exists because we recognize that those who are not morally responsible for their conduct should not be punished. The commitment procedures exist because we recognize that those defendants acquitted by reason of insanity should be cared for in institutions that provide psychiatric and psychological services while protecting society. *See, e.g., United States v. Chandler*, 393 F.2d 920, 928 (4th Cir.1968) (en banc).

The Insanity Defense Reform Act neither prescribes nor prohibits an instruction on the consequences of the verdict. However, because mandatory commitment evaluation procedures now exist, we should move to eliminate the potential prejudice to defendants caused by juror uncertainty about whether defendants acquitted because of insanity will be released into society. We now should adopt the rule of the District of Columbia Circuit: Whenever a defendant properly raises an insanity defense, the jury should be instructed about the legal consequences of a verdict of not guilty by reason of insanity, unless the defendant clearly requests that the instruction not be given. *See Lyles v. United States*, 254 F.2d at 728–29.

The judgment of the district court should be reversed and the case remanded for retrial.